## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHANIE BAKER,

        Plaintiff,

    v.

BENTON AREA SCHOOL DISTRICT,
COLUMBIA MONTOUR SNYDER
UNION COUNTIES OF CENTRAL
PENNSYLVANIA SERVICE
SYSTEM, COLEEN GENOVESE,
KELLY KOCHER, and
LINDSAY RADO,

        Defendants.

No. 4:16-CV-02311

(Judge Brann)

## MEMORANDUM OPINION

### OCTOBER 29, 2019

## I.     BACKGROUND

"A poet or other who can make nothing clear, can stir up enough sediment to render the bottom of a basin as invisible as the deepest gulf in the Atlantic."[1]

This Court, sitting about 170 miles from the Atlantic, finds the bottom of this basin—a summary judgment ruling in full favor of Defendants—only partially visible. Plaintiff has stirred up enough factual sediment to cloud the Court's view and impair a conclusive victory for Defendants.

---

[1]    Walter Savage Landor, Imaginary Conversations, Volume I 78 (1824).

Defendants Benton Area School District ("BASD"), Coleen Genovese, Kelly Kocher, and Lindsay Rado (collectively with BASD, the "BASD Defendants") moved for summary judgment against Plaintiff Stephanie Baker. Defendant Columbia Montour Snyder Union Counties of Central Pennsylvania Service System ("CMSU") also moved for summary judgment against Baker.

## A.    Procedural History

Baker sued Defendants on November 17, 2016.[2]  Her Complaint had four claims.  Count I alleges under 42 U.S.C. § 1983 that Defendants retaliated against Baker for exercising her free speech rights, and "conspired with each other and with others to" do so.[3]  Count II alleges under the Pennsylvania Whistleblower Law[4] that Defendants retaliated against Baker for being a whistleblower.[5]  Count III alleges that CMSU violated Baker's due process rights under 42 U.S.C. § 1983 by terminating her without notice or an opportunity to be heard.[6]  Count IV alleges that Defendants Genovese, Kocher and Rado published defamatory and false communications about Baker.[7]

---

[2]    ECF No. 1.

[3]    *Id.* at ¶¶ 54-55.

[4]    43 Pa.C.S. § 1421 *et seq.*

[5]    ECF No. 1 ¶¶ 61-62.

[6]    *Id.* ¶¶ 67-68.

[7]    *Id.* ¶ 65.  Baker's Complaint has two paragraphs numbered 65, 66, and 67.

On August 28, 2017, I decided Defendants' motions to dismiss.[8] I dismissed Baker's First Amendment retaliation claim (Count I) against CMSU and BASD. I also dismissed Baker's due process claim (Count III) and defamation claim (Count IV) in their entirety. But I granted Baker leave to amend her Complaint.

Baker filed an Amended Complaint on October 4, 2017.[9] The BASD Defendants and CMSU each moved for summary judgment on July 8, 2019.[10] Each of these motions are now ripe for disposition. For the reasons that follow, each of these motions is GRANTED IN PART AND DENIED IN PART.

## II.    DISCUSSION

### A.    Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[11] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] "Facts that could alter the outcome are 'material facts,' and

---

[8]    *See* ECF Nos. 26 and 27.

[9]    *See* ECF No. 30.

[10]    *See* ECF Nos. 52 and 53.

[11]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[12]    Fed. R. Civ. P. 56(a).

disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[13] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[14] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[15] When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[16]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[17] Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[18] "The mere existence of a scintilla of evidence in support of the

---

[13] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[14] *Clark*, 9 F.3d at 326.

[15] *Id*.

[16] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[17] *Liberty Lobby, Inc*., 477 U.S. at 252.

[18] *Id*.

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[19]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[20]  The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[21]  "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[22]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be

---

[19]  *Id.*

[20]  *Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

[21]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).

[22]  *Id.*

resolved in favor of either party."[23]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[24]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[25]  Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[26]  On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[27]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine

---

[23]  *Liberty Lobby*, 477 U.S. at 250.

[24]  Fed. R. Civ. P. 56(c)(1).

[25]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[26]  Fed. R. Civ. P. 56(e)(2).

[27]  Fed. R. Civ. P. 56(c)(3).

whether there is a genuine issue for trial."[28] "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[29] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[30]

## B. Undisputed Facts[31]

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter.

### 1. Baker's Employment with Synergy and Issues with Her Attendance

In March 2013, Synergy Systems Group, Inc. ("Synergy") hired Baker to work as a "Blended Counselor" with BASD.[32] Baker has a degree in criminology from Indiana University of Pennsylvania. She does not have a certification from the Pennsylvania Department of Education.[33] When Baker was working with BASD's middle/high school (seventh to twelfth grade), Genovese was the principal, Kocher was the guidance counselor, and Rado was the special education director.[34]

---

[28] *Liberty Lobby*, 477 U.S. at 249.

[29] *Id.*

[30] *Id.* at 249–50 (internal citations omitted).

[31] I have drawn all inferences in these facts in favor of Baker. *See* Standard of Review, above at § II.A.

[32] ECF No. 30 ¶ 14; ECF No. 55 Ex. 3.

[33] ECF No. 55 Ex. 2 ("Baker Dep.") 4:25-5:16.

[34] ECF No. 55 Ex. 4 ("Genovese Dep.") 5:24-6:9; ECF No. 30 ¶¶ 7-9.

When Baker was working at BASD under Synergy, she sometimes needed to attend off-site meetings with Synergy's CEO, Glenn Simington.[35]  Baker did not tell Genovese about these meetings beforehand.[36]  Genovese would then get upset because she didn't know where Baker was.[37]  Genovese memorialized these concerns in an email titled "Absences" of March 12, 2015, where she told Baker:

> As the building principal, please make me aware of when you will and will not be in the district (sick, personal, vacation days etc).  I realize that I am not the one who approves your days, but I need to be aware of when you will be out.  Me knowing your whereabouts is always important, but especially at this time of year moving to graduation when we need all hands on deck.

Baker replied that she was "sorry for not telling you personally that I was leaving today" and would "be sure to do so in the future."[38]

In November or December 2015, Kocher brought more issues with Baker's attendance to Genovese's attention, relating that Baker was "coming late . . . almost every single day" and "leaving early."[39]  Genovese discussed this with Baker, instructing Baker again to let her know when Baker would be out.[40]

After this discussion, Genovese heard that Baker had been saying negative things about Genovese in the community.  Some of Kocher's family told Genovese

---

[35]  ECF No. 55 Ex. 2 ("Baker Dep.") 9:18-20; *id.* 116:3-4.

[36]  *Id.* 116:8-13.

[37]  *Id.* 116:3-8.

[38]  ECF No. 55 Ex. 8.

[39]  Genovese Dep. 17:19-19:22.

[40]  Genovese Dep. 20:2-14; ECF No. 55 Ex. 5 ("Kocher Dep.") 28:14-29:3.

that Baker was at a wine fest in October 2015. Per Kocher's family, Baker was intoxicated and told them how much she hated Genovese and that Genovese was a "bitch" and a "cunt."[41] Genovese also heard that Baker had been talking to teachers about how much she hated the school district.[42]

Baker would tell Rado about discipline issues that Baker saw in BASD, like students showing bullying behaviors. Rado would tell Baker that she needed to bring these issues up with Genovese, because they were out of Rado's department (special education).[43] Baker would tell Rado that Baker did not agree with some of the decisions that Genovese made on these issues.[44]

### 2. Fall 2015: The Video Incident

In fall 2015, Baker became aware of a cell phone video. A BASD twelfth-grade boy had filmed two eighth-grade boys[45] in the middle/high school's restroom. The twelfth-grader flipped the camera around. He and the eighth-

---

[41] Genovese Dep. 67:17-68:16; Kocher Dep. 33:22-25, 37:21-38:9. Baker has provided a sworn declaration attesting that this "did not happen and [she] did not make such statements or call Genovese those words." ECF No. 69 Ex. 69 at 2. But this is still relevant to Genovese and Kocher's state of mind throughout these events. The Court then will admit evidence of Genovese and Kocher's state of mind at this time—what they *thought* Baker had been saying or doing—as a hearsay exception. *See* Fed. R. Evid. 803(3).

[42] Kocher Dep. 39:7-12. Again, this is on its face hearsay but relevant and admissible as proof of what Genovese *thought* Baker was saying. *See* Fed. R. Evid. 803(3).

[43] ECF No. 55 Ex. 6 ("Rado Dep.") 54:12-55:20.

[44] Rado Dep. 52:10-53:22.

[45] CMSU and Baker dispute the eighth-graders' educational status. Baker testified that the eighth-graders were special education. Baker Dep. 82:15-20. Genovese testified that one eighth-grader was receiving learning support and the other was in regular classes. Genovese Dep. 96:6-12.

graders were all in the same frame.[46]  The eighth-graders extended their middle

fingers to the camera.[47]  Vulgar, sexually explicit rap music was playing in the

background.[48]  All three students were fully-clothed and laughing.[49]  The twelfth-

grader later uploaded the video on Instagram.[50]

After the video went up on Instagram, another BASD student told Baker

about it.[51]  Baker watched the video.  Right after watching the video, Baker

decided that Genovese needed to know about it.[52]  She went to Genovese's office.

Genovese, Kocher, Rado, and a Pennsylvania state trooper were already there.

They all watched the video.[53]

At that point Baker was a mandated reporter.[54]  Baker did not believe the

video warranted a report to the authorities.[55]  And no one who watched the video in

Genovese's office, including the state trooper, expressed that it would trigger a

mandated reporter's reporting duty.

---

[46]   In common parlance, a "selfie."

[47]   Baker Dep. 82:1-9.

[48]   Baker Dep. 82:11-14.

[49]   Baker Dep. 82:15-20, 82:23-83:2; Genovese Dep. 70:15-18.

[50]   Baker Dep. 82:11-14; Genovese Dep. 72:20-21.

[51]   Baker Dep. 9:24-10:11.

[52]   Baker Dep. 10:22-24, 11:24-12:16, 77:11-78:12.

[53]   Baker Dep. 11:24-12:8; Genovese Dep. 113:12-20; Kocher Dep. 85:22-86:3.

[54]   Baker Dep. 10:23-25; *see* 23 Pa. Stat. and Cons. Stat. Ann. § 6311 (listing those "required to report suspected child abuse").

[55]   Baker Dep. 11:9-20.

Genovese and Kocher met with all the students in the video.[56]  The twelfth-grader told Genovese and Kocher that he was "trying to be funny" in making the video.[57]  Genovese gave the twelfth-grader an in-school suspension for violating BASD's cell phone policy.[58]  Genovese informed the twelfth-grader's parent about the incident and about the punishment she had meted out for the twelfth-grader.[59]  Genovese decided to not inform the eighth-graders' parents.[60]

### 3.    The Post-Video SAP Meeting

At some point after the video incident, BASD held a Student Assistance Program ("SAP") meeting.[61]  At this meeting, before Kocher arrived, Baker raised concerns about whether the school should have notified the eighth-graders' parents about the video incident.[62]  Genovese was not in attendance.[63]

---

[56]  Genovese Dep. 72:3-72:19; Kocher Dep. 86:2-3; Rado Dep. 76:5-7.

[57]  Kocher Dep. 91:17-25.

[58]  Genovese Dep. 71:20-73:11; Kocher Dep. 90:25-91:2.

[59]  Genovese Dep. 72:20-73:11.

[60]  Genovese Dep. 72:20-73:6, 85:5-18; Kocher Dep. 84:10-87:11. CMSU and Baker dispute Genovese's motivation for not doing this.  Genovese testified that she concluded that the eighth-graders' level of involvement "amounted to horseplay" and "the worst thing they did [was] violate the cellphone policy and . . . [give] the middle finger to the camera."  Per Genovese, this conclusion drove her decision not to report.  Baker argues that Genovese chose not to report because the twelfth-grader was the son of a school board member.  *See* Genovese Dep. 71:25-72:1.

[61]  SAP meetings happen on a regular basis.  ECF No. 55 Ex. 7 ("Ross Dep.") 11:19-20.  They allow BASD teachers, faculty and administration to recognize student behaviors that interfere with academic success.  *Id*. 8:6-10.  The SAP team always includes the school's nurse and its guidance counselor.  *Id.* 8:23-24.  SAP team membership requires special training and certification.  *Id.* 10:16-19.  Between 2015 and 2016, Ross, Kocher, Genovese, Baker, three other faculty members, and two secretaries were on the SAP team.  *Id.* 8:16-10:13.

[62]  Baker Dep. 13:10-21; Kocher Dep. 89:14-90:7.

Kocher then arrived and informed the group that a decision had been made not to inform the eighth-graders' parents. Baker raised her disagreement.[64] Kocher acknowledged Baker's disagreement. Kocher and Deb Ross (the school nurse) joked as to whether Baker was going to be the one to tell Genovese that she disagreed with Genovese's decision.[65] The conversation ended at that point.[66] Kocher noted that Baker raising her concerns about the video incident in the SAP meeting was inappropriate, because the incident was not a SAP issue but a discipline issue.[67]

### 4. Baker's Change in Employment from Synergy to CMSU

In January 2016, Synergy dissolved. CMSU took over Synergy's functions. CMSU decided to absorb Synergy's "blended" staff (including Baker) and offer

---

[63] *See* Kocher Dep. 89:14-90:21.

[64] Ross Dep. 18:8-20:24. Baker admits that she did not directly tell Genovese that she disapproved of Genovese's treatment of the video incident. Baker Dep. 21:3-23:23. CMSU and Baker dispute whether anyone told Genovese of Baker's disapproval. *See* ECF No. 55 ¶ 49; ECF No. 68 ¶ 49. Likewise, the BASD Defendants and Baker dispute whether Baker has any basis for alleging that Genovese or Rado knew that Baker disagreed with how Genovese handled the video incident. *See* ECF No. 54 ¶ 9; ECF No. 67 ¶ 9.

[65] Kocher Dep. 89:14-90:21; Ross Dep. 23:18-24:5.

[66] Kocher Dep. 90:21. CMSU and Baker dispute whether Genovese (either herself or working through Kocher) gave a directive to the SAP members in attendance to not discuss the video incident with anyone or to report it to the authorities. *See* ECF No. 55 ¶¶ 44-48; ECF No. 68 ¶¶ 44-48.

[67] Kocher Dep. 89:24-90:7. CMSU and Baker dispute whether Ross noted the same thing. *See* ECF No. 55 ¶ 43; ECF No. 68 ¶ 43.

them positions.  Baker became a CMSU employee.  Her title was Drug and

Alcohol Prevention Specialist.[68]

Baker received a probationary appointment.[69]  She knew going into this

position that if she showed acceptable performance for six months, she would be

promoted to regular civil service status.[70]  CMSU gave Baker access to its

personnel policies and staff manual via the company Intranet.[71]  Baker also

received this manual via email in April 2016 and reviewed it.[72]

Baker started her appointment with multiple introductory meetings with

CMSU personnel to review policies and procedures.[73]  Baker's job duties did not

change with her move from Synergy to CMSU.[74]  CMSU gave her a job

description document that memorialized her duties.[75]  The job description indicated

that Baker's regular work schedule would be from Monday to Friday, during

school hours.  She would work a total of 37.5 hours a week.  The job description

listed Baker's exact start and end times as "varies."[76]  This was because school

---

[68]   ECF No. 55 Ex. 11 ("Beach Dep.") 15; ECF No. 55 Ex. 12.

[69]   ECF No. 55 Ex. 12.

[70]   ECF No. 55 Ex. 12.

[71]   Beach Dep. 16:13-23.

[72]   Baker Dep. 111:2-10; ECF No. 55 Exs. 19 and 20.

[73]   Baker Dep. 111:16-24.  CMSU and Baker dispute the content and substance of these
      meetings.  *See* ECF No. 55 ¶ 57; ECF No. 68 ¶ 57.

[74]   Baker Dep. 84:4-7.

[75]   Beach Dep. 19:9-16; ECF No. 55 Ex. 21.

[76]   ECF No. 55 Ex. 21.

hours varied. And Baker would sometimes have to work a weekend or an evening.[77]

CMSU required Baker to submit weekly timesheets to her supervisor.[78] This was Allison Wilson, a Prevention Supervisor with CMSU.[79] Wilson reviewed timesheets to make sure the employee had worked the recorded hours. She would also monitor sick time and vacation time.[80] Wilson explained to Baker that if Baker intended to use sick or vacation time, Baker would need to attach an additional form to her time sheet.[81] CMSU's written policies also required her to seek approval for time off and notify her supervisor (Wilson) if she needed unexpected time off.[82]

CMSU's written policy on overtime stated:[83]

Employees whose FLSA status is Non-exempt will be compensated by payment for all hours worked in excess of their regular workweek. Hours worked in excess of 40 hours per week will be reimbursed at a rate of not less than time and one-half the regular hourly rate. Except in the case of emergencies, non-exempt staff adhere to their established work schedule and secure their supervisor's approval

---

[77] Beach Dep. 21:23-22:9; ECF No. 55 Ex. 9 ("Wilson Dep.") 71:17-72:4. CMSU testified that its policy is to tell employees such as Baker "that they are to work school hours," "evenings when it's required and weekends when it's required." Beach Dep. 23:11-24:7. CMSU and Baker dispute whether CMSU followed through on this policy in Baker's case. *See* ECF No. 55 ¶ 63; ECF No. 68 ¶ 63.

[78] Wilson Dep. 20:13-21:1; Baker Dep. 85:9-15, 114:3-6.

[79] Wilson Dep. 10:7-9, 13:17-14:11.

[80] Wilson Dep. 21:21-22:12.

[81] Wilson Dep. 22:18-23:15.

[82] Baker Dep. 121:9-21.

[83] ECF No. 55 Ex. 17 at 4.

whenever overtime is anticipated. . . . Compensatory time is permissible for FLSA exempt employee on an hour-per-hour basis. The decision for granting overtime shall be made by individual departments of CMSU.

CMSU encouraged its employees to "flex" their time within a given pay period. This meant employees would adjust their timesheets so that the timesheets wouldn't show them working over their normal hours. Then CMSU could avoid having to pay overtime.[84] Baker never told Wilson that she did not understand CMSU's flextime policy.[85]

Wilson's supervisor was Barbara Gorrell, a Drug and Alcohol Administrator with CMSU.[86] Richard Beach was CMSU's Administrator. This is CMSU's highest position.[87]

### 5.    May 2016: Concerns with Baker's Attendance

In May 2016, Baker texted Kocher and Genovese. She said she was going to come into school, get her laptop, and then work from home for the day.[88] Kocher and Genovese were not sure if CMSU's policies allowed that.[89] Genovese

---

[84] Baker Dep. 112:24-113:10, 184:20-185:8. CMSU and Baker dispute whether CMSU clearly explained this flextime policy to Baker. *See* ECF No. 55 ¶ 75, ECF No. 68 ¶ 75.

[85] Wilson Dep. 168:9-11. CMSU and Baker dispute whether Ms. Wilson reviewed the flextime policy with Baker at CMSU's quarterly prevention meetings. *See* ECF No. 55 ¶ 77, ECF No. 68 ¶ 77.

[86] ECF No. 55 Ex. 13 ("Gorrell Dep.") 11:13-16, 13:2-15.

[87] Beach Dep. 10:17-18, 14:19-21.

[88] Kocher Dep. 34:11-13, 37:5-20.

[89] Kocher Dep. 34:14-20. Gorrell testified during her deposition that CMSU's policies did not allow that. Gorrell Dep. 38:18-22.

directed Kocher to call CMSU.[90]  Kocher agreed, thinking that the last time

Genovese tried to handle a perceived problem with Baker's attendance, Genovese

afterwards heard that Baker was spreading negative comments about Genovese in

the community.[91]  Kocher called Wilson.[92]

On one day in May 2016, Baker indicated on her timesheet that she had

worked.  But she was not working that day.  She was out sick.[93]

### 6.    May 31, 2016: The Written Warning and Meeting

Wilson issued Baker a "Written Warning" dated May 31, 2016.[94]  The

warning reads as follows.  Baker admitted in her deposition that she did not inform

Ms. Wilson of her taking off early from work or of her late arrivals.[95]

> This letter serves as a formal reprimand for your violation of program policy, failure to report your absence(s) from work, inaccurately reporting hours worked on your timesheet and tardiness.
>
> I was informed that you were absent from working specifically on 5/23/16 and came into work approximately 1 hour late on 5/24/16.

---

CMSU and Baker dispute whether during this period, Baker was also showing up late to work without following CMSU's policy, and whether Baker was misreporting her time aside from the May 2016 timesheet issue.  *See* ECF No. 55 ¶ 81, ECF No. 68 ¶ 81.

[90]   Kocher Dep. 34:17-20.

[91]   Kocher Dep. 34:20-23.

[92]   Kocher Dep. 35:2-9. CMSU and Baker dispute the reason why Kocher called Wilson and the central message that Kocher communicated during the call.  *See* ECF No. 55 ¶ 83, ECF No. 68 ¶ 83.

[93]   Wilson Dep. 30:10-13.

[94]   ECF No. 55 Ex. 24.

[95]   CMSU and Baker dispute whether Baker documented her time correctly.  *See* ECF No. 55 ¶ 87, ECF No. 68 ¶ 87.

You failed to notify me of either of these absences and did not reflect any use of sick and/or personal time used during these times.

Additionally, I was made aware of concerns that you have been frequently tardy in the morning when arriving to working and during the month of May have either left early from work or came in late due to personal reasons. None of this time was reported to me or reflected in your timesheets.

As stated in the policy and procedural manual, all staff are to seek approval for time off and notify their immediate supervisor when unexpected time off is needed. Staff is also expected to accurately report hours worked on their weekly timesheets.

\* \*

CMSU also extended Baker's probationary period another three months. She became ineligible for a bonus. And she was on notice that "further incidents of this nature are subject to disciplinary action up to and including termination of employment."[96]

On June 1, 2016, Baker met with Wilson and Gorrell. They reviewed the warning.[97] Wilson reviewed CMSU's policies and procedures, including the policy on time reporting and overtime.[98] Around this time, Ross noted that Baker "got excited about things and . . . got more and more irritated."[99]

---

[96] ECF No. 55 Ex. 24.

[97] Baker Dep. 121:21-24.

[98] Wilson Dep. 36:16-18, 166:13-18.

[99] Ross Dep. 41:14-16. CMSU and Baker dispute whether, after Baker was reprimanded, Baker reacted poorly and took her frustration out on Kocher, acting unprofessionally at a meeting by making sarcastic comments in front of parents. *See* ECF No. 55 ¶ 90, ECF No. 68 ¶ 90.

### 7. June 22, 2016: Baker's Six-Month Performance Review

Baker was up for a six-month performance review at the end of June 2016. This review happened on or around June 22, 2016. Baker met with Wilson.[100]

In the review, Baker scored "unsatisfactory" for "work habits."[101] She received the following comments.[102] Baker did not dispute that she failed to inform Wilson of the events that these comments referenced.[103]

> During this reporting period, Stephanie failed to keep her supervisor informed of changes to her work schedule and did not inform her immediate supervisor when taking time off. School Staff members report that she was late and left early on several occasions. Additionally, Stephanie did not accurately report hours worked on her timesheet. This was addressed and Stephanie was made aware that she must notify her immediate supervisor as soon as possible when taking accrued time off and of any changes to her work schedule.

The review also noted in the "additional evaluation comments":[104]

> Stephanie is aware that she must improve her tardiness and is also expected to accurately report hours worked on her timesheets. She will notify her supervisor immediately of any changes to her schedule and obtain approval from her supervisor before taking any accrued time off.

> We will be extending Stephanie's probationary period by an additional 3 months due to her violation of program policy, tardiness and failure to accurately report hours.

---

[100] *See* ECF No. 55 Ex. 26.

[101] The BASD Defendants and Baker dispute Baker's overall scoring. "[W]ork habits" is but one category on the review. *See* ECF No. 54 ¶ 11; ECF No. 67 ¶ 11.

[102] ECF No. 55 Ex. 26.

[103] Baker Dep. 134:4-18.

[104] ECF No. 55 Ex. 26.

## 8.     Summer 2016: The Anonymous Letter

In July or August 2016, Plaintiff and two co-authors[105] drafted an anonymous letter.[106]  They sent the letter to BASD's superintendent and to BASD school board members.  The letter addressed Baker's and the co-authors' concerns with BASD.[107]

Baker and her co-authors had been discussing the letter and drafting for several months.  They met a handful of times.  Baker typed the letter.  But she did not contribute to all its content.[108]  She didn't contribute to sections on (a) an alleged violation of special education law; (b) a change in morale at the middle/high school under Genovese; and (c) complaints about the use of paraprofessionals.[109]  She did contribute to six sections: (a) surveys that the BASD superintendent had sent out; (b) the video incident; (c) the school's "blended and cyber academy"; (d) the school's turnover rate; (e) the school's anti-bullying program; and (f) the "339 program."  The Court's transcription of these six sections follows.

---

[105]  *See* ECF No. 68 ¶ 98; ECF No. 54 ¶ 12.

[106]  They had been discussing the letter and drafting for several months.  *See* Baker Dep. 27:13-29:8.

[107]  ECF No. 55 Ex. 27; Baker Dep. 27:13-29:8.

[108]  Baker Dep. 27:13-29:20.

[109]  Baker Dep. 29:16-20, 31:17-21, 35:9-36:12. Baker and CMSU dispute what the letter was designed to communicate about BASD's work with students with IEPs.  *See* ECF No. 55 ¶ 103; ECF No. 68 ¶ 103.  Likewise, the BASD Defendants and Baker dispute whether Baker was familiar with any of the students' IEPs that were referenced in the letter.  *See* ECF No. 54 ¶ 14; ECF No. 67 ¶ 14.

(a)     Surveys[110]

The survey you distributed at the end of the school year sparked a
significant amount of continued conversation amongst the faculty and
staff in the Middle/High School. Many people were reluctant to
complete the survey primarily because they were to be returned to
Paula Shannon, recognizing that confidentiality and anonymity would
most definitely be breached. We're sure it's very telling that many
people went through inter-office mail to have you receive their
surveys. Also telling, is the lengths at which people took to remain
anonymous, for example, writing with their non-dominant hand,
scanning and copying completed surveys, and having others write
their responses for them. All of this was done out of fear of being
recognized and the retribution that would follow. The few surveys that
were given to Paula were, in fact, shared with Coleen and
subsequently they sat and read them, laughing at the concept of the
survey in general.

(b)     The Video Incident

During the school year, a 30-second article revealed a situation that
occurred at the high school, of which students, parents and community
members were aware of. [S.F.], a senior, exploited two 8th grade
learning support students ([Z.G. and K.J.]) by videotaping them in
restroom facilities. The video was placed on Instagram with sexually
explicit music and vulgar comments. Coleen called Shane's mother,
Ann [F], directly to notify her of the online video; it was immediately
taken off social media. The victims' parents should have been notified
as well; however, Coleen specifically stated that no one was allowed
to inform them. [S]'s only punishment for this heinous act was one
day of in-school suspension. It appears that the law and school policy

[110] Baker testified that she based her input on this section on: (a) "the surveys that the
superintendent sent out"; (b) "[s]everal different staff members" telling her that they "were
afraid to be honest because they knew it wouldn't be confidential"; (c) Deb Ross telling her
that Ross "didn't trust taking it to the guidance office, that she was going to fill it out and she
was going to send it in her office mail directly to him so that no one else saw it"; (d) "a lot of
teachers," including Donna Wrenchler and Crystal Moller, "talking about it and they were
very nervous about filling it out."  Baker Dep. 29:21-31:11.

The numbering in this section is for the reader's convenience.  These numbers weren't in the
original document.  The Court has also made slight typographical edits, which it reflects in
bracket.  *See* ECF No. 55 Ex. 27.

would support notification of the police, Children & Youth, and an expulsion hearing to determine the appropriate discipline. This incident should not have been minimized as a joke! He received preferential treatment. (Could it have something to do with Coleen and Ann (and their husbands being seen dining together at a social event?)

Blended and Cyber Academy[111]

The Blended and Cyber Academy . . . has been another embarrassment in the community. Everyone is aware that there is no true curriculum being taught or followed and students merely complete "packets" of work independently. [A.H.] was a regular education student (without an IEP) who has miraculously completed all educational credits via the [Academy], despite excessive absences. An educational plan was created to ensure her graduation without academic accountability. What is the credibility of this program if students can complete all graduation credits in such a short amount of time? How can we justify giving these students the same diploma that we give to the students who work hard, for years, to meet the PA state required academic graduation requirements?

---

[111] The record, and the parties' interpretation of the record through their Statements of Material Facts, generates confusion as to whether Baker contributed to this section. In her deposition, Baker was asked for "information that you had" "concerning the blended and cyber academy." She replied that she had no information "[o]ther than the fact that students [were] telling me that they had to do packets and stuff." Baker Dep. 35:23-36:2. The Court cannot conclude that Baker made massive contributions to this section. But, drawing all inferences from the facts in Baker's favor, the Court can conclude that she did contribute in some fashion.

Turnover[112]

Some other issues that are linked to the administration include the turnover rate of employees. The former Special Education Director (April Farrell) and her secretary (Shannon Yarnell) left due to the hostile and unprofessional work environment that was created in the office. Ironically, two friends of the office staff were hired to fulfill these positions. It's common knowledge that Coleen and Lindsay Rado are best friends and former co-workers, and Tiffany Kester and Paula Shannon are close friends. . . .

The Anti-Bullying Program[113]

The school district is not in compliance with the state mandated anti-bullying program, as there is none. Several staff members were trained to teach the Olweus anti-bullying curriculum which was implemented in the past; however, recently it has been removed from the middle-school students' schedules. How do you justify eliminating a state mandated program?

---

[112] Baker testified that she based her input on this section on: (a) Kocher telling her "that if [Genovese] decided she didn't like me, I would be gone," and sharing anecdotes to support this; (b) Farrell telling Baker why she left; (c) comments that Genovese, Rado, Kester, and Shannon made about their friends; (d) Hackenburg, Ullcheny and Holmes saying that "none of them wanted to go to the elementary school, but they all were made to go"; and (e) Hackenburg having a sexual relationship with another teacher and "everyone in the office . . . talking about it." Baker Dep. 36:13-40:10.

Baker testified that she did not contribute to these statements: (a) two other staff members being "sabotaged of their positions"; (b) "Other staff members have been switched to different buildings or moved to different positions if they were not favored by 'the office.'" Baker Dep. 40:24-41:6.

[113] Baker testified that she based her input on this section on Kocher telling Baker in the beginning of the 2014-2015 school year that they could not fit the anti-bullying curriculum into the middle school schedule. Baker Dep. ¶ 41:7-15. Baker and the BASD Defendants dispute other aspects of the letter's critique of the anti-bullying program and Kocher's role in it. *See* ECF No. 54 ¶ 15; ECF No. 67 ¶ 15.

The "339 Program"[114]

[W]hile we are unaware of the specific guidelines required by the 339 programs, we are aware that Kelly Kocher has not complied with the mandated requirements; the Benton school district has not attended any of the mandated meetings for this program.

\* \*

Baker didn't make anyone at CMSU aware of the letter when she was drafting it. Nor did she complain to anyone at CMSU about the letter's subjects of concern.[115]

### 9. BASD's Reactions to the Letter

On August 22, 2016, the BASD superintendent emailed Genovese and Rado about the letter. This was the first they'd heard of it.[116] They talked to the superintendent about the letter. But he refused to show them the letter.[117]

Kocher learned about the letter later that fall when Genovese and Rado told her about it.[118] Kocher never saw the letter at any relevant time.[119] Genovese saw

---

[114] Baker testified that she based her input on this section on: (a) talk about the program "at other meetings that I had been to with other counselors," describing it as "a state mandated program that is supposed to help career development within the schools in grades K through 12"; (b) at these meetings, the other counselors "would all mention and talk about these 339 meetings that their schools would go to and attend, and they all told me that Benton was not at any of them." Baker Dep. 44:4-46:4.

[115] Baker Dep. 104:6-14; Wilson Dep. 202:20-203:22; Gorrell Dep. 66:13-25, 163:16-21.

[116] Baker and the BASD Defendants dispute when Genovese learned that Baker authored the letter, and whether Genovese accused Baker of being the author to Rado or Kocher. *See* ECF No. 54 ¶ 17; ECF No. 67 ¶ 17.

[117] Genovese Dep. 34:14-35:3, 39:2-41:22; Rado Dep. 48:24-51:3.

[118] Kocher Dep. 92:8-14. CMSU and Baker dispute whether, upon learning of the letter, Genovese, Rado, and Kocher believed that Baker drafted the letter. *See* ECF No. 55 ¶¶ 114-16; ECF No. 68 ¶¶ 114-16.

the letter sometime in the fall of 2016.[120]  Rado saw the letter before Baker was

terminated.[121]  Rado also heard a rumor from one of the teachers that Baker wrote

the letter.[122]

### 10. Fall 2016: Comments about Baker; Baker Brings Concerns About Student Discipline to Rado

In the beginning of the 2016-2017 school year, BASD faculty members

came to Genovese with comments about Baker.[123]

- Jodi Kline, the head of BASD's math department, told Genovese that Baker was "constantly questioning [Genovese's] decisions," "talk[ing] terribly behind your back," and "say[ing] that she doesn't agree with anything . . . that you're doing as far as in the way that [Genovese] disciplined kids."[124]

- Genovese's secretary, Cathy Hartman, said she wanted to quit the SAP team because "all [Baker] did was stir up trouble, was a horrible distraction, talked about things that were not relevant to the SAP process . . . [and] had this hatred for [Genovese] and that was just affecting [Baker's] ability to do her job."[125]  Hartman memorialized her concerns in a note dated September 14, 2016.

- Chris Mitchell, the head of the science department, said that Baker kept coming into his classroom and asking him to set up meetings with the

---

[119]  Kocher Dep. 92:17-18.

[120]  Genovese Dep. 48:17-25.  CMSU and Baker dispute whether Genovese did not see the letter until after Baker was terminated.  *See* ECF No. 55 ¶ 118; ECF No. 68 ¶ 118.

[121]  Rado Dep. 57:1-16.

[122]  Rado Dep. 47:5-48:10.

[123]  As with the above facts about Baker's comments at the wine fest, the Court can admit these statements as proof of their impact on Genovese's state of mind.

[124]  Genovese Dep. 27:11-28:13.

[125]  Genovese Dep. 28:22-29:4; ECF No. 55 Ex. 28.  Baker does not dispute the content of the testimony but argues that it was vague and that Hartman's note was part of a scheme to support Baker's termination.  *See* ECF No. 68 ¶ 122.

superintendent.  Mitchell did not understand and thought Baker was "jumping the chain of command."  Mitchell also wrote a memo dated September 14, 2016 where he documented one instance of Baker asking for a meeting with the superintendent.[126]  Rado's understanding was that Baker was trying to get Mitchell to join the superintendent's advisory committee in order to talk to the superintendent about the performance of administrators.[127]

- Ross believed that Baker was "undermining," "trying to generate some animosity in some way," "creating that havoc" and "stirring the pot." Examples were saying "mean girl type things" with a "middle school mentality," "describing [cliquey] relationships," "taking one hour lunches and being behind closed doors for an extended period of time," and "indicat[ing] that [Genovese] would make fun of the way people dressed."[128] Ross stated that it seemed to her that "that was [Baker's] focus like even beyond her job," and that Baker was "with certain staff members talking all the time," and, though Ross didn't "know what they were talking [about]," "it just seemed like it was again a stirring pot mentality."[129]

Kocher also heard from at least seven school personnel that Baker was saying that "we were all cliquey," "that we were horrible professionals," and that Baker "didn't like the way that [she] handled certain students or situations."[130]

Genovese heard from Kocher that at field hockey practice, Baker "told the kids

---

[126]  Genovese Dep. 29:19-30:10; ECF No. 55 Ex 29.

[127]  Rado Dep. 42:25-43:17.

[128]  Ross Dep. 39:20-42:22.

[129]  Ross Dep. 41:18-23.

[130]  Kocher Dep. 56:12-25.  The BASD Defendants and Baker dispute whether Kocher thought she could send students to Baker to receive counseling.  See ECF No. 54 ¶ 20; ECF No. 67 ¶ 20.

that [Genovese did] X, Y and Z and [Genovese was] a liar and . . . a terrible person."[131]

Baker would also go to Rado with concerns about student discipline, which was out of Rado's domain as special education coordinator.[132] This happened multiple times.[133]

To try and address the above, Genovese requested that Kocher set up a meeting with CMSU.[134]

### 11.    September 12, 2016: The Meeting at CMSU

On or around September 12, 2016, Genovese, Kocher, Wilson, Beach, and Gorrell met.[135] The meeting participants did not make a formal decision to terminate Baker at that meeting.[136] The anonymous letter was not the reason for

---

[131] Genovese Dep. 55:14-20.  Baker has no knowledge of Kocher, Genovese, and/or Rado ever saying, to each other or anyone else, that they believed Baker was a danger to them.  Baker Dep. 24:5-26:14.

[132] Rado Dep. 52:13-55:20.

[133] *Id.*

[134] Genovese Dep. 31:2-32:18; Kocher Dep. 57:7-60:24.  The BASD Defendants and Baker dispute whether this was at the request of other BASD employees who asked Genovese to "do something" about Baker's behavior.  *See* ECF No. 54 ¶ 24; ECF No. 67 ¶ 24.

[135] *See, e.g.,* Genovese Dep. 32:19-24.  CMSU and Baker dispute whether Genovese and Kocher wanted to hold the meeting in order to bring up CMSU terminating Baker.  *See* ECF No. 55 ¶ 132; ECF No. 68 ¶ 132, and the BASD Defendants and Baker dispute whether Genovese and Kocher asked CMSU to terminate Baker or change her placement.  *See* ECF No. 54 ¶ 27; ECF No. 67 ¶ 27.

Rado testified that she did not know that the meeting was being planned until the day of. Rado Dep. 36:8-17.  The BASD Defendants and Baker dispute whether Rado knows anything about the substance of the meeting or has discussed it with Genovese and Kocher. See ECF No. 54 ¶ 25; ECF No. 67 ¶ 25.

[136] *See, e.g.,* Kocher Dep. 60:5-16; Wilson Dep. 196:20-197:10; Gorrell Dep. 118:17-25.

the meeting.[137]  But the participants discussed the letter and its contents, including the subjects to which Baker contributed.[138]  The participants did not discuss distributing surveys about Baker.[139]

Wilson and Beach remembered that Genovese and Kocher expressed suspicion about Baker's involvement with the letter.[140]  Aside from the letter, Kocher and Genovese showed "disappointment" and "dismay" about Baker's "work behavior" and "attitude."[141]  They said that Baker was "difficult to work with" and "questioned authority," and that Baker was "taking sides" in "a situation in Benton between the school staff and the superintendent," "trying to get teachers

---

[137]  Genovese Dep. 130:14-20.

[138]  In this finding of fact, I make inferences in Baker's favor—as I must do—from witnesses' deposition testimony.  *See* Kocher Dep. 151:17-152:3; Wilson Dep. 38:18-39:7; Beach Dep. 35:19-38:1, 117:14-118:4, 182:13-183:6.  This finding contradicts other testimony.  *See* Beach Dep. 219:12-220:14; Gorrell Dep. 69:16-70:17.  But the other testimony is self-serving.  And, considering the rules I must follow, I can't take this contradiction in total favor of Defendants.  It cuts towards the parties resolving this dispute at trial.  "As a general rule, if conflicting testimony appears in the affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses."  Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 2726.1 (2d ed.); *see also Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) ("[S]ummary judgment is not a procedure for resolving a swearing contest.").

[139]  Genovese Dep. 58:21-59:2; Kocher Dep. 62:6-10.

[140]  Wilson Dep. 38:18-23; Beach Dep. 117:14-118:4.  CMSU and Baker dispute the weight that Beach placed on the letter when deciding to terminate Baker.  Baker argues that parts of Beach's deposition testimony about the letter are untruthful, inaccurate, and self-serving.  *See* ECF No. 55 ¶ 137-38; ECF No. 68 ¶ 137-38.  The BASD Defendants and Baker dispute aspects of Genovese and Kocher's conduct during the meeting, as well as Baker's knowledge of Genovese, Kocher, and Rado's influence on Baker's termination.  *See* ECF No. 54 ¶¶ 28-29; ECF No. 67 ¶¶ 28-29.

[141]  Gorrell Dep. 76:7-15.

to align with the superintendent to go against the school administration."[142]
Kocher and Genovese described that "these are all the reports we are hearing from
the teachers and we are [at] kind of a loss now as to what to do," with Kocher
saying she was "sad" and "upset."[143]  The CMSU participants heard "concerns . . .
that [Baker] had been making inappropriate comments to other staff in the district
about . . . Genovese and to community members out in the community."[144]  And
Kocher stated that Baker had been unprofessional and disrespectful to Kocher in a
parent meeting after Baker had received her reprimand in May.[145]  Genovese and
Kocher expressed that they could not work with Baker anymore.[146]

### 12.    CMSU's Reaction to the September 12, 2016 Meeting

CMSU believed its employees had a certain role.  Wilson testified that "as
an employee, it's inappropriate to go out and bad-mouth those who you work for.  I
don't think that's professional."  Wilson testified that it wasn't Baker's job "to

---

[142]  Beach Dep. 35:20-36:3, *see also id.* 89:4-6.  Baker and the BASD Defendants dispute
Baker's factual basis for alleging that the BASD Defendants convinced Wilson and Gorrell
to pursue Baker's termination.  *See* ECF No. 54 ¶ 16; ECF No. 67 ¶ 16.

[143]  Kocher Dep. 59:18-60:16.

[144]  Wilson Dep. 40:21-24.

[145]  Wilson Dep. 37:2-11. Baker disputes that she was unprofessional and disrespectful.  *See*
footnote 99, above; *see also* ECF No. 67 ¶ 26.  But Baker does not dispute that Kocher
brought this up during the September 12 meeting. Gorrell testified that if she had learned of
this conduct when it happened, she "probably would have terminated [Baker] then because it
was clearly a violation of something that we had just met with her about being respectful and
accountable to school staff."  Gorrell Dep. 60:7-22.

[146]  Kocher Dep. 154:22-155:6; Wilson Dep. 195:13-197:18.

question what's going on in the district."[147]  Gorrell testified that "we certainly

have spoken with the school-based staff that their role is not to get involved with

personnel issues or any of the dynamics or cooperation or lack of amongst staff

within the school, that that's not our role, that they as CMSU employees stay out of

personnel matters."[148]  Per Gorrell, CMSU employees in school districts needed to

"be able to meld within those school districts and each particular climate," not

"align themselves with different staff members or take sides," and "abide by the

rules and step in line, stay in your own lane."[149]  CMSU conveyed to Baker that if

she perceived problems with the school she was working in, she should bring

concerns to Wilson, her supervisor.[150]

Gorrell testified that following the September 12, 2016 meeting, "we [at

CMSU] were all astounded.  We were disappointed.  We felt that there was

irreparable damage perhaps between the relationship that was going on there with

school administration."[151]

---

[147]  Wilson Dep. 50:4-51:19.

[148]  Gorrell Dep. 72:20-73:2.

[149]  Gorrell Dep. 73:5-19.  CMSU states that "if [Baker] had any complaints about BASD, she could have expressed those complaints directly with [Wilson]."  ECF No. 55 ¶ 145.

[150]  Gorrell Dep. 74:13-16.  Baker concedes this, but she notes that "any such complaints or issues expressed to a CMSU supervisor would have been meaningless."  ECF No. 68 ¶ 145. Wilson's testimony supports this.  *See* Wilson Dep. 222:19-22 ("I mean, she could complain about it to me.  There's not much we can do with regard to that. That's the school district.") But that does not change the undisputed fact of how CMSU instructed Baker to handle these issues.  Baker does dispute whether she made any complaints to Wilson about her treatment by any of the employees of BASD.  *See* ECF No. 55 ¶ 146; ECF No. 68 ¶ 146.

[151]  Gorrell Dep. 53:12-17.  Gorrell's testimony on this point continues with Gorrell referencing that CMSU had "already extended her probation for similar concerns."  Gorrell Dep. 53:17-

CMSU then drafted a termination letter for Baker around September 15, 2016.[152]  But CMSU ultimately decided against terminating Baker on or around September 15, 2016.[153]  CMSU instead extended Baker's probationary period.[154]

CMSU decided to distribute a survey about Baker's performance.[155]  Gorrell prepared the survey with questions pulled from a civil service form.  Wilson reviewed the survey before it was finalized.[156]  At first CMSU only disseminated surveys about Baker's performance because it was only having issues with Baker.  But CMSU has since implemented the survey for other school-based employees when they are up for review.[157]

### 13.    September 15, 2016: Baker's Performance Review

On September 15, 2016, Baker met with Wilson and Gorrell.  The purported reason was an employee review and evaluation.[158]  Baker's performance review

---

18.  As Baker points out, *see* ECF No. 68 at 147, this is disputed: "the extension of probation was allegedly because of perceived issues about being late for work or working a day from home."

[152]  Wilson Dep. 115:1-117:22; ECF No. 55 Ex. 30.

[153]  *See, e.g.*, Gorrell Dep. 53:4-59:14.

[154]  *See, e.g.*, Wilson Dep. 56:9-20.  Baker and CMSU dispute the purpose of extending Baker's probationary period—whether it was to gather additional information on Baker's performances and the concerns Genovese and Kocher had, or whether it was to justify the decision to terminate Baker.  *See* ECF No. 55 ¶ 150; ECF No. 68 ¶ 150.

[155]  The surveys were Wilson's idea.  Gorrell Dep. 53:12-54:8.

[156]  Wilson Dep. 57:6-60:17; Gorrell Dep.81:20-82:16; ECF No. 55 Ex. 31.

[157]  Beach Dep. 106:22-107:7; Wilson Dep. 72:19-25, 207:1-208:13.

[158]  ECF No. 30 at ¶ 43; ECF No. 55 Ex. 32.  The BASD Defendants and Baker dispute the actual reason for the meeting.  *See* ECF No. 54 ¶ 30; ECF No. 67 ¶ 30.

stated that Baker "needs improvement" on "Communications," noting: "Stephanie needs to develop communication skills that include her ability to exercise discretion and appropriate boundaries."[159]  This rating related to the concerns that Genovese and Kocher had raised about Baker's professionalism.  Wilson and Gorrell discussed general professionalism concerns and emphasized the importance of being professional, but they did not mention Genovese and Kocher's specific complaints.[160]

The performance review stated Baker "needs improvement" on "Interpersonal Relations/Equal Employment Opportunity (EEO)."[161]  "Needs improvement" is defined as "Often has difficulty getting along with others. Allows personal bias to affect job relationships. . . . Requires reminders regarding needs and sensitivities of others. . . . Inconsistently adheres to EEO diversity program requirement."[162]

Baker's "overall rating" on the performance review was "needs improvement."  The review noted: "As the blended outreach coordinator/prevention specialist, maintaining professionalism and promoting a productive and harmonious work environment is crucial. CMSU intends to conduct

---

[159]  ECF No. 55 Ex. 32 at 1.  Baker disputes the accuracy of the comments, but she provides no evidence in support besides her statement that her signature on the employee review did not indicate her agreement.  ECF No. 68 ¶ 154.

[160]  Gorrell Dep. 51:15-52:23; Wilson Dep. 41:25-42:4, 223:21-224:25.

[161]  Baker disputes the accuracy of this rating.  ECF No. 68 ¶ 156.

[162]  ECF No. 55 Ex. 32.

additional evaluations including direct communications with School personnel to insure that all aspects of Stephanie's work are satisfactory and comply with expectations of her role there."[163]

At the meeting, Wilson and Gorrell informed Baker that CMSU would be extending her probation another six months, and that CMSU intended to distribute surveys about Baker's performance to BASD.[164]  Baker showed concern about the surveys.  Baker said that she had disagreed with how Genovese handled "a situation that happened at school" "involv[ing] a student and a SAP meeting"— *i.e.*, the video incident—and that Genovese had directed everyone in the following SAP meeting not to contact parents.[165]  Baker did not say when this SAP meeting occurred.[166]

Baker said that an "anonymous letter" referenced the SAP meeting issue. She said that Genovese and Kocher were upset with Baker because they thought she wrote the anonymous letter.[167]  Baker expressed her "concern for retaliation

---

[163]  ECF No. 55 Ex. 32.  Baker disputes the accuracy of the "needs improvement" rating, as well as whether Wilson or Gorrell prepared this performance review and accompanying evaluation meeting in good faith.  ECF No. 68 ¶ 158-59.

[164]  *See, e.g.*, Wilson Dep. 107:3-13.

[165]  Wilson Dep. 107:8-108:6.

   When Genovese learned that Baker had made these accusations about her, she "did not want [Baker] to work in my school anymore."  Genovese Dep. 73:19-74:18.

[166]  Wilson Dep. 108:7-11.

[167]  Gorrell Dep. 110:13-112:25.

and any negative surveys that would come from the office slash guidance office [Genovese and Kocher]."[168]  Baker denied writing the letter.[169]

Baker claims that she never discussed the letter with anyone at CSMU before CMSU distributed the surveys.[170]  Baker does not believe that she ever told anyone at CMSU that she wrote the letter.[171]  Baker was not aware of any conversations between CMSU staff and Kocher, Genovese, or Rado about the letter prior to CMSU distributing the surveys.[172]

### 14.    Reactions to the September 15, 2016 Performance Review

After the September 15, 2016 performance review, Wilson contacted Kocher to figure out what was going on in terms of the things Baker had just told her about the SAP meeting and purported directive not to report the video incident.[173]

Also, Baker attempted to contact Wilson on her cellphone "a couple, a few" times.[174]  Wilson did not take Baker's calls because it was "uncomfortable" and

---

[168]  Gorrell Dep. 64:23-65:1.

[169]  Gorrell Dep. 111:21-112:6.

[170]  Baker Dep. 103:11-104:9.

[171]  Baker Dep. 103:11-19.

[172]  Baker Dep. 104:10-14.

[173]  Wilson Dep. 147:19-148:5, 191:17-194:9.  CMSU and Baker dispute whether Wilson contacted Kocher because she was a mandated reporter and needed to figure out if something improper had occurred.  *See* ECF No. 55 ¶ 170; ECF No. 68 ¶ 170.  They also dispute whether Kocher told Wilson that the situation Baker recounted to Wilson about the directive to report the incident did not occur.  *See* ECF No. 55 ¶ 171; ECF No. 68 ¶ 171.

[174]  Wilson Dep. 108:25-109:11.

"awkward."[175]  Gorrell emailed Baker "and said . . . we've made a decision and it's really not something we can negotiate at this point nor are we willing to."[176]

Wilson ultimately spoke with Baker when Baker called her office.  Baker expressed that the extension of her probationary period was unfair.  She also asked Wilson to not mention the SAP meeting situation with BASD.[177]  Wilson asked "if there was something going on that made [you] uncomfortable, why [you] wouldn't have come to me sooner with it."  Baker told Wilson "that it happened during her employment with Synergy, that that specific incident didn't occur while she was employed with CMSU."[178]  Baker also said that it was Kocher (not Genovese) who had directed the personnel in the SAP meeting not to contact parents.  Wilson thought Baker "changed her story" and was "uncomfortable"; that was a "red flag" for Wilson.[179]  Wilson did not inform Baker about her conversation with Kocher.[180]

---

[175] Wilson Dep. 109:6-15.  CMSU and Baker dispute the frequency of these calls, as well as the purpose behind Baker making these calls, and whether Wilson, Beach and Gorrell felt these calls were appropriate.  *See* ECF No. 55 ¶ 173-74; ECF No. 68 ¶ 173-74.

[176] Gorrell Dep. 79:17-20.  CMSU and Baker dispute the purpose of this email.  *See* ECF No. 55 ¶ 175; ECF No. 68 ¶ 175.

[177] Wilson Dep. 109:23-110:4.

[178] Wilson Dep. 110:10-18.

[179] Wilson Dep. 193:18-194:15.  Baker disputes whether Baker "changed her story" to Wilson by first (a) telling Wilson that it was Genovese who gave the directive not to report the video incident, and then (b) telling Wilson that it was Kocher communicating Genovese's directive not to report.  *See* ECF No. 55 ¶¶ 178-80; ECF No. 68 ¶¶ 178-80.  But Baker provides no relevant factual record to challenge Wilson's testimony.  Baker provides many citations to her saying that it was Kocher who gave the directive, but no citations to her telling Wilson, the first time, that it was Kocher who gave the directive.  Thus, the Court cannot conclude that Baker has raised a genuine dispute of fact about this.

[180] Wilson Dep. 193:7-9.

### 15.    September 9, 2016 and September 16, 2016: Baker's Timesheets

In the week ending September 9, 2016, Baker worked overtime. She could not "flex" the additional hours off, because it was a short week (due to Labor Day).[181]   Baker "was late sending this timesheet" to Wilson, so Wilson "had to call her to find out what hours she worked this week and . . . recorded them down for her."[182]   Baker and Wilson agreed that Wilson would submit overtime for Baker for that week.[183]   Wilson marked down 1.5 hours of overtime for Baker on her timesheet.[184]

In the week ending September 16, 2016 (a full week of school), Baker only logged 37 hours on her timesheet. Wilson asked Baker why she only logged 37 hours instead of 37.5. Baker replied that she "was flexing time off from the flex time I had the week before." Wilson "reminded [Baker that she had] put in overtime for [Baker] for that" over the phone.[185]   Wilson crossed off the 0.5 hours of "flex [time] used" that Baker had recorded on her September 16, 2016 timesheet.[186]

---

[181]   Wilson Dep. 17:11-18:11.

[182]   Wilson Dep. 179:18-180:16; ECF No. 55 Ex. 34.

[183]   Wilson Dep. 17:11-18:11.

[184]   Wilson Dep. 181:9-11; ECF No. 55 Ex. 34. BASD did not review Baker's timesheets. Kocher Dep. 54:9-11.

[185]   Wilson Dep. 18:4-18:11. Baker and CMSU dispute whether Baker "falsified her timesheets." *See* ECF No. 55 ¶ 181; ECF No. 68 ¶ 181.

[186]   ECF No. 55 Ex. 34. Baker and CMSU dispute whether Wilson was then "uncomfortable because CMSU engaged in extensive and ongoing trainings and explanations of timesheets,

Wilson or Gorrell informed Beach of the above sometime between September 15, 2016, and September 28, 2016.[187]

### 16.     September 19, 2016: The Surveys

On September 19, 2016, Gorrell emailed the surveys to Genovese and Kocher, copying Wilson and Beach.[188]  Gorrell's cover email stated that she needed the surveys, which she called "a questionnaire/evaluation," "in order to complete an evaluation of Stephanie Baker's work performance."  Kocher then sent the surveys to the entire staff at the BASD high school.[189]  The opening paragraph of the surveys specifically stated that CMSU was "requesting this information as part of our employee evaluation process."[190]

CMSU then received the completed surveys.  Wilson and Beach read every one.[191]  Gorrell read "[t]hose that came across my desk."[192]  Nineteen were positive and six were negative.[193]

---

flex time, and overtime, which was especially true for [Baker]; however, [Baker] continued to misreport her time."  Baker and CMSU also dispute whether this was a "situation of falsification."  *See* ECF No. 55 ¶¶ 186-87; ECF No. 68 ¶¶ 186-87.

[187]  Beach Dep. 99:8-99:8, 100:16-19, 162:14-163:16; 187:22-188:7, 226:3-24; Gorrell Dep. 142:17-143:8, 188:13-16.

[188]  Wilson Dep. 117:23-25; ECF No. 55 Ex. 35.

[189]  ECF No. 55 Ex. 35.

[190]  ECF No. 55 Ex. 38.

[191]  Beach Dep. 120:10-14; Gorrell Dep. 94:16-19.

[192]  Gorrell Dep. 93:24-25.

[193]  ECF No. 35 Ex. 37, ECF No. 35 Ex. 38.

- Genovese wrote on her survey that:[194]

  o "I have received complaints from faculty regarding Stephanie trying to set private meetings with the Superintendent on his behalf. I have received complaints from faculty and my secretary regarding Stephanie's perceived repeated "stirring the pot" behavior. I have received complaints about Stephanie complaining about how I handle discipline issues. She will state to people that she does not agree with how it was handled and explain how she thinks It should've been handled."

  o "Following an incident where I addressed her punctuality, it was reported to me by several community members shortly after I addressed her that she was bad-mouthing me publically."

  o "It was reported to me by my guidance counselor, Kelly Kocher, that Stephanie Baker went into a meeting at CMSU on September 15, 2016 and reported to their team that I save a directive to my SAP ream not to report a "reportable" incident to parents and/or C:hlldren and Youth. I was also told by Kelly that the next day, she recanted that version of her story to her boss and then stated that I wasn't in fact the one who gave the directive, but instead it was Kelly that gave it on my behalf. That is an outright lie which states that I gave an illegal directive. This is an attack on my professionalism, my ethics, and my character not only as the principal of this school, but as an individual."

  o "I do not feel that Stephanie Baker has the ability to be effective in her job at Benton MS/HS."

- Kocher wrote on her survey that:[195]

  o "In most situations Stephanie handles herself in a professional manner and adheres to policies and procedures; however, I believe that she sometimes steps out of her realm of duties. As a CMSU mental health worker, she should come here, do her job and go home. Unfortunately I believe that Stephanie sometimes

---

[194] ECF No. 54 Ex. 16.

[195] ECF No. 54 Ex. 17.

gets caught up in some negative feelings she has for this district/principal. She really needs to keep those thoughts and feelings in check as a professional instead of openly talking about it to various staff members. It makes them feel uncomfortable. Most of us just want to work as a team peacefully and when Steph does that, it makes it uncomfortable and difficult… and really hard to fix."

o  "[Baker's] weaknesses are that she gets caught up in drama and sometimes creates it. When it gets to the point where faculty and staff members are saying that she is stirring the pot, there is great concern about her effectiveness in our school. Trust begins to deteriorate and then team work is affected. I begin to wonder If she is talking about my effectiveness, decisions and how I handle situations to other staff members… and then ultimately I do not want to go to her with things to handle.

• Rado wrote on her survey that:[196]

o  "I am hearing that she has involvement in trying to, "rally," teachers together in an attempt to speak with the superintendent regarding the performance of administrators."

o  "I am an administrator in the district. There have been multiple instances of times when she should have informed the principal of things that are going on instead of myself (IE bullying issues, repeated offenses of having the same conversations with students and their behavior isn't changing). I have told her this a few times and she still continues to only seek me out."

o  "I used to think [that Baker could develop and maintain positive and constructive relationships with other staff], but not anymore after learning about her recent behaviors of being involved in the creation of an anonymous letter and seemingly "working for" the superintendent to try and throw administrators under the bus. At times, I have also given her a directive, only for her to challenge what I am telling her to do; she is not in a position to undermine me, but she has before."

[196] ECF No. 54 Ex. 18.

o "Conduct and ethical behavior related to security is in question as of late, I have every reason to believe she, along with the superintendent, have collaborated to write an anonymous letter about the administrators in the district. In that letter, confidential information was disseminated to community members, as student's names and private case information was mentioned in detail."

Genovese did not request on her survey that Baker be removed from BASD, disciplined in any way, or terminated. Kocher and Rado also made no such request.[197] Genovese, Kocher, and Rado did not discuss the content of their surveys with each other or anyone else.[198]

Wilson testified that the negative surveys raised "some concerns with regard to some of the feedback that was received."[199] Beach testified that the negative surveys conformed to perceived issues with Baker's time because those surveys said that Baker "wasn't available, that she wasn't around, that she couldn't be contacted."[200]

The BASD superintendent commented on his survey that "there has been nothing relayed to me from my administrators with the exception of punctuality that was solved last year that is of question in her job performance." Beach did not find this helpful because the surveys "were sent out in September. And then last

---

[197] ECF No. 54 Ex. 16-18.

[198] Genovese Dep. 76:4-18; Rado Dep. 39:4-15; Kocher Dep. 68:1-20.

[199] Wilson Dep. 152:15-18.

[200] Beach Dep. 119:21-120:9. Baker and CMSU dispute details of Beach's reaction to a specific survey that indicated that Baker allowed a student to stay at her home. *See* ECF No. 55 ¶¶ 194-95; ECF No. 68 ¶¶ 194-95.

year when she had the punctuality problem, there were only two months of the school year that he's accounting for in this evaluation is this year. And obviously after this, she had problems with her punctuality and her time reporting and being where she was supposed to be and taking off when she wasn't supposed to take time off."[201]

### 17.    September 28, 2016: CMSU Terminates Baker

Beach decided to terminate Baker.  One factor was the September 2016 timesheet issue.  Another factor was the survey responses.  Another factor was the complaints made by Genovese and Kocher.[202]  Another factor was Baker's relationship with BASD staff.  Another factor was the letter, its contents, and CMSU's belief that Baker authored it.[203]  After Beach made the decision, Beach notified Genovese.  Genovese asked Beach to hold off on terminating Baker until after the upcoming school board meeting.[204]

---

[201]  Beach Dep. 152:8-153:10.

[202]  Beach Dep. 99:3-13, 111:5-11; Gorrell Dep. 85:24-86:21.  CMSU and Baker dispute whether Beach's testimony that the September 2016 timesheet situation was "the final straw" for CMSU was true.  *See* ECF No. 55 ¶¶ 197, 199; ECF No. 68 ¶¶ 197, 199.

[203]  Beach Dep. 119:3-8.  Baker and CMSU dispute whether there were "serious questions about [Baker's] truthfulness and integrity."  *See* ECF No. 55 ¶ 202; ECF No. 68 ¶ 202.  Baker and CMSU also dispute the role that the contents of the anonymous letter played in the decision to terminate Baker.  *See* ECF No. 55 ¶ 203; ECF No. 68 ¶ 203.  I make the above finding by drawing all inferences in the facts in Baker's favor.  I draw particular inferences from the September 12, 2016 meeting and from Rado's survey responses.

[204]  Genovese Dep. 54:17-56:17.  Baker and CMSU dispute exactly when this conversation between Beach and Genovese happened.  *See* ECF No. 55 ¶¶ 205-208; ECF No. 68 ¶¶ 205-208.

On September 28, 2016, Baker met with Wilson, Gorrell, and Beach. They informed Baker that CMSU was terminating her from her employment.[205] Baker received a termination letter stating that she was being terminated due to "Unsatisfactory Work Performance" and "Violation of Program Policies and Procedures."[206]

### C. Analysis

#### 1. The Court's Prior Motion to Dismiss Ruling

Baker argues that the "law of the case" doctrine mandates that the Court deny Defendants' summary judgment motions.[207] I disagree.

Baker is right that the Court denied portions of Defendants' motions to dismiss Baker's original complaint.[208] But the "law of the case" doctrine – a "judicial rule of practice meant to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit"[209] – doesn't help Baker here. This doctrine "does not limit the power of trial judges to reconsider their [own] prior decisions." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) (citing *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). Interlocutory orders such as a denial of a motion to

---

[205] ECF No. 30 ¶ 61.

[206] Gorrell Dep. 165:15-166:21.

[207] *See* ECF No. 66 at 3-6.

[208] *See* ECF No. 26.

[209] *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) (citing Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 4478 (2d ed.) (internal quotations omitted).

dismiss "remain open to trial court reconsideration, and do not constitute the law of the case." *Id.* (citing *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994). This Court's prior denial of portions of Defendants' motions to dismiss thus doesn't dictate my consideration of Defendants' motions for summary judgment.[210]

This threshold point is now behind us.[211] I move to the parties' more substantive arguments. In this discussion, I keep in mind that the core of Baker's claims here involve allegations about what certain defendants were thinking or what certain defendants knew. Retaliation, conspiracy, defamation – they all hinge on a defendant's mental state. And "inferring mental state from circumstantial evidence is among the chief tasks of factfinders. We rely on the good sense of jurors (and, where applicable, trial judges) to distinguish [a defendant's mental state] where the direct evidence is necessarily scanty." *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012), as amended (Feb. 7, 2012).

---

[210] Baker's supporting cases are all inapposite. Both *In re City of Philadelphia Litig.*, 158 F.3d 711 (3d Cir. 1998), and *Yurchak v. Cty. of Carbon*, No. 06-2307, 2007 WL 1316127 (3d Cir. May 7, 2007), deal with the United States Court of Appeals for the Third Circuit, not a district court, allowing the law of the case doctrine to preclude its review of an issue it had previously decided. In *Minard Run Oil Co. v. U.S. Forest Serv.*, 549 F. App'x 93, 94 (3d Cir. 2013), the Third Circuit affirmed the district court's decision to allow a Third Circuit decision (not the district court's own prior decision) to serve as the law of the case.

[211] Given that Baker's "law of the case" argument is not in play, I decline to consider the "additional factual allegations and evidence" that Baker has compiled in countering CMSU and the BASD Defendants' statements of material facts. *See* ECF Nos. 67, 68.

## 2. Baker's § 1983 Claim of First Amendment Retaliation

### a. First Amendment Claims and Pennsylvania's Intermediate Units

Trying to build another threshold barrier, the BASD Defendants argue that because Baker was employed by CMSU and not by BASD, Baker can't sue the BASD Defendants under a theory of First Amendment retaliation.[212] The BASD Defendants note that they "are unaware of any case in which First Amendment protections have been expanded to protect an individual who is not an employee or independent contractor of a public entity." They also cite a Third Circuit statement that "if expansion in [First Amendment holdings] is to come the source should be the Supreme Court."[213]

The Court's own research contradicts the BASD Defendants' statement about the barren field of case law. In *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1364 (3d Cir. 1993), Judge Collins J. Seitz, writing for a unanimous three-judge panel of the United States Court of Appeals for the Third Circuit, "assume[d], without deciding," that the Third Circuit could treat a volunteer firefighter the same as a public employee for purposes of a First Amendment retaliation claim. Judge Jane Richards Roth, in a short unanimous opinion in

---

[212] ECF No. 60 at 12-13.

[213] ECF No. 60 at 13; *McClintock v. Eichelberger*, 169 F.3d 812, 817 (3d Cir. 1999). Baker doesn't mention this argument in her brief in opposition. *See* ECF No. 66. And BASD doesn't bring it up again in its reply brief. *See* ECF No. 75. Nor did BASD raise this point in its initial motion to dismiss. *See* ECF Nos. 20, 24.

*Houston v. Twp. of Randolph*, 559 F. App'x 139, 142 (3d Cir. 2014), held that the plaintiff's "role as a volunteer firefighter [was] sufficient to trigger First Amendment scrutiny." And Judge Thomas J. Ambro, again writing for a unanimous panel in *Eggert v. Bethea*, 625 F. App'x 54, 55 (3d Cir. 2015), made the same kind of *Versarge* assumption by performing the standard First Amendment analysis on a volunteer EMT.

But what of district courts within the Third Circuit? Well, in *Jones v. Indiana Area Sch. Dist.*, 397 F. Supp. 2d 628, 633 (W.D. Pa. 2005), the plaintiff—an employee of an "intermediate unit" just like CMSU—sued her intermediate unit employer alongside the school district in which the intermediate unit was providing services. Her claims included First Amendment retaliation. Judge David Cercone of the Western District of Pennsylvania allowed the case to survive summary judgment. In *Smith v. Sch. Dist. of Philadelphia*, 158 F. Supp. 2d 599, 606 (E.D. Pa. 2001), Judge Jan E. DuBois of the Eastern District of Pennsylvania applied *Pickering* to a plaintiff who was "acting as a volunteer member of [a support team] and thus had a quasi-employment relationship with the school district."[214] And in *Snyder v. Millersville Univ.*, No. CIV.A. 07-1660, 2008 WL 5093140, at \*14 (E.D.

---

[214] *See also Allen v. Sch. Bd. for Santa Rosa Cty., Fla.*, 782 F. Supp. 2d 1304, 1324 (N.D. Fla. 2011), *on reconsideration*, No. 3:10CV142/MCR/CJK, 2011 WL 13112091 (N.D. Fla. May 12, 2011) (applying *Smith* to school volunteers' Establishment Clause challenge to the school's restriction of their speech).

Pa. Dec. 3, 2008), Judge Paul S. Diamond of the Eastern District of Pennsylvania held that First Amendment protections extended to a student teacher.

Moving outside the Third Circuit and its district courts, at least four other Circuits have concluded that volunteers, student teachers, and interns receive First Amendment protections. *See Gratsch v. Hamilton County*, 2001 WL 406440 (6th Cir. Apr. 3, 2001) ("Although Gratsch was more of an independent contractor or volunteer, rather than an employee, the district court appropriately analyzed his claims under the test applied to employee speech. His relationship with the state in this context resembled an employer-employee relationship more than it resembled the relationship between sovereign and private citizen."); *Hennessy v. City of Melrose*, 194 F.3d 237, 244 (1st Cir. 1999) (concluding that a student teacher is entitled to First Amendment protection); *Andersen v. McCotter*, 100 F.3d 723 (10th Cir. 1996) (concluding that an intern who received a part-time salary is entitled to First Amendment protection); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir. 1979) (affording volunteer firefighter First Amendment protection).

Further, the Court is reluctant to contradict a prior Third Circuit statement. But the Court finds this statement inapposite when considering how Pennsylvania's intermediate units work. The Supreme Court itself expanded the sweep of First Amendment holdings to include independent contractors in the first place. In *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996),

Justice Anthony Kennedy rejected various policy arguments in declining "to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees." And the Pennsylvania statute that governs intermediate units shows that intermediate units are closer to full-fledged school district employees than they are to independent contractors. "Each school district of the Commonwealth shall be assigned to an intermediate unit, and shall be entitled to the services of an intermediate unit. . . . Intermediate units shall be part of the public school system of this Commonwealth." 24 P.S. § 9-901-A. Intermediate units must provide their assigned districts with auxiliary services, which include guidance, counseling, psychological and visual services, remedial services, and speech and hearing services. 24 P.S. § 9-922.1-A. They can also provide a host of other services if their board of directors authorizes it. 24 P.S. § 9-914-A.

It defies logic to include independent contractors and volunteers within the First Amendment's sweep, but then exclude intermediate units, which their enacting statute reveals are **dependent** contractors.[215] The Supreme Court has already set the outer bound here as independent contractors. My ruling—which falls right in line with how another Pennsylvania district court has handled this

---

[215] That is: they have to contract with a school district at the district's request. *See* Wilson Dep. 50:9-17.

exact same situation—does not expand the outer bound.[216]  Given Third Circuit

and district court persuasive authority, as well as the nature of intermediate units,

the Court rejects BASD Defendants' threshold argument.

### b.    The Elements of Retaliation

Baker claims that Defendants "retaliated against [her] because [she]

exercised her First Amendment free speech rights" in co-authoring the anonymous

letter, and in speaking to other BASD faculty about whether they would speak with

BASD's superintendent.[217]  Baker must show "(1) constitutionally protected

conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from

exercising his constitutional rights, and (3) a causal link between the

constitutionally protected conduct and the retaliatory action."  *Thomas v. Indep.*

*Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citations omitted).

As a public employee,[218] Baker's speech—the anonymous letter and

speaking to other BASD faculty about speaking to the superintendent—would

constitute "protected activity" (satisfying the first prong above) if "(1) in making it,

[she] spoke as a citizen, (2) the statement involved a matter of public concern, and

(3) the government employer did not have an adequate justification for treating the

---

[216]  *See, e.g., Heritage Constructors, Inc. v. City of Greenwood, Ark.*, 545 F.3d 599, 601 (8th Cir. 2008) (analyzing *O'Hare Truck* as creating a "threshold issue" of whether the plaintiff "had either a pre-existing commercial relationship with the city, or was a regular provider of services to it")

[217]  ECF No. 30 ¶ 67.

[218]  Per the analysis in the previous section.

employee differently from any other member of the general public as a result of the statement [s]he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quotations omitted). "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social, or other concerns to the community." *Majewski v. Fischi*, 372 F. App'x 300, 303 (3d Cir. 2010).

To show the requisite "causal link," Baker must show that her "protected activity was a substantial motivating factor in the state actor's decision to take the adverse action." *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (citations omitted). She is not required to show that the protected activity was the sole, dominant, or primary factor in the decision. *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977)). "Defendants can counter this "by showing that [they] would have taken the same action even in the absence of the protected conduct." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). At that point, Baker may only prevail by "discrediting [Defendants'] proffered reason for [the employment action], . . . or by adducing evidence . . . that discrimination was more likely than not a motivating or substantial cause of the adverse action." *Montone v. City of Jersey City*, 709 F.3d 181, 202 (3d Cir. 2013) (citations omitted).

## 1. Baker's Conduct as "Protected Activity"

Here, in contributing to her sections of the anonymous letter, and in speaking to other BASD faculty about whether they would speak with BASD's superintendent, Baker was speaking as a citizen. In *Lane v. Franks*, the United States Supreme Court clarified that the central question here is "whether the speech at issue itself is **ordinarily** within the scope of an employee's duties, not whether it **merely concerns** those duties." 573 U.S. 228, 240 (2014) (emphasis added). Drafting and submitting an anonymous letter to a school district superintendent and organizing faculty to speak to a superintendent about issues are activities not ordinarily within the scope of Baker's duties as a "Blended Counselor" or as a Drug and Alcohol Prevention Specialist.[219] Baker was thus speaking as a citizen and not as a public employee. *See Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 988-90 (3d Cir. 2014) (applying *Lane* to hold that a school district employee's complaints of misconduct by the district superintendent constituted citizen speech because the employee's "routine job responsibilities" did not include reporting misconduct).[220]

---

[219] *See* ECF No. 55 Ex. 3 (Baker's resume listing job duties); ECF No. 55 Ex. 21 (job description for the Drug and Alcohol Prevention Specialist position).

[220] *See also Javitz v. Cty. of Luzerne*, No. 18-2389, 2019 WL 5076366, at *5 (3d Cir. Oct. 10, 2019) (reporting wrongdoing not enough to tip into employee speech "absent some formal duty or responsibility"); *Bradley v. W. Chester Univ. of Pennsylvania State Sys. of Higher Educ.*, 226 F. Supp. 3d 435, 444 (E.D. Pa. 2017), *aff'd but criticized*, 880 F.3d 643 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 167 (2018) (citing *Dougherty* and finding it determinative that the plaintiff's duties did not involve recognizing and reporting alleged misconduct).

The sections of the anonymous letter that Baker authored,[221] as well as her organizing activity, qualify as matters of public concern. Public education issues like those that Baker brought up "can be fairly considered as relating to any matter of political, social, or other concerns to the community." *Majewski v. Fischi*, 372 F. App'x at 303. *See also Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (a speaker seeking to "bring to light actual or potential wrongdoing or breach of public trust" on the part of government officials was speaking on a matter of public concern) (citations omitted); *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005) (parties did not dispute that "advocacy on behalf of . . . two disabled students" was a "matter[] of true public concern").[222]

---

The Court acknowledges that the Third Circuit has "consistently held that complaints up the chain of command about issues related to an employee's workplace duties . . . are within an employee's official duties" and therefore not made as a citizen. *Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012). If Baker's conduct here had fallen inside the schema of her work, that line of cases might have some credence. But this situation, as I have outlined above, is different.

[221] CMSU argues that only the letter's statements about the video incident should be considered as Baker's protected speech with respect to CMSU, because Baker only mentioned the statements about the video incident in the September 15, 2016 performance review. *See* ECF No. 73 at 14. I cannot follow this path. First, this would disregard Baker's speaking to other faculty about whether they would speak with BASD's superintendent. Second, I must draw all inferences in the facts in favor of Baker. Here, I can infer from the facts that: (a) Genovese read the letter, and got a solid grasp of its different areas of subject matter, before meeting with CMSU; (b) Genovese communicated her grasp of the letter and its subject areas to CMSU during the September 12 meeting; so that (c) before making the decision to terminate Baker, CMSU had knowledge of all the different subject areas of the letter as well as Genovese and Kocher's suspicion that Baker wrote the letter.

In a related matter, the Court often uses "the letter" as shorthand in its analysis. It only means to refer to the sections of the anonymous letter to which Baker contributed.

[222] *See also Knaub v. Tulli*, 788 F. Supp. 2d 349, 358 (M.D. Pa. 2011) (complaints dealt with "matters of public concern as the public would be interested in whether a public school was

Defendants argue that they had "adequate justification" to treat Baker differently. They cite the balancing test that the Supreme Court, in *Pickering v. Bd. of Ed. of Twp. High School Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568, has mandated I perform. In this test I need to balance (1) the "interests of the teacher, as a citizen, in commenting upon matters of public concern," against (2) "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Here, as "[s]peech involving government impropriety occupies the highest rung of First Amendment protection," *Swineford v. Snyder County Pa.*, 15 F.3d 1258, 1274 (3d Cir.1994), "defendants in the present case bear a truly heavy burden."[223] *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005). Also, where "an employee serves no confidential, policymaking, or public contact role" (as with Baker), "the danger to the agency's successful functioning from that employee's private speech is minimal." *Rankin v. McPherson*, 483 U.S. 378, 390 (1987). The record does not indicate that the speech in question "greatly disrupted the functioning of [BASD or

---

abiding by federal and state law"); *Poteat v. Harrisburg Sch. Dist.*, 33 F. Supp. 2d 384, 394-95 (M.D. Pa. 1999) (speeches that "related to the quality of education students would receive" and "related to the effectiveness of the education" "dealt with matters of public concern").

[223] CMSU tries to minimize the impact of *Swineford* and calls it distinguishable. *See* ECF No. 73 at 16. The Court disagrees. Taking together (a) the subjects of the letter to which Baker contributed, and (b) her trying to meet with the superintendent to affect change, Baker's speech "involv[ed] government impropriety."

CMSU.]" *Id.*[224]  I do not find that BASD had adequate justification under *Pickering* to treat Baker differently.[225]

## 2.    Defendants' Actions as "Adverse"

CMSU seems to concede that their extensions of Baker's probationary period, launching of the survey, and Baker's termination were adverse actions. The BASD Defendants argue that their actions were not adverse.  I disagree.

Genovese's and Kocher's complaints were one factor in Baker's termination.  These complaints came in the context of the September 12, 2016 meeting that Genovese and Kocher had set up in order to address concerns that they had about Baker.  Genovese and Kocher met with Wilson (Baker's supervisor), Gorrell (Wilson's supervisor), and Beach (CMSU's chief executive).

---

[224] A good amount of Defendants' evidence of Baker's so-called "disruption" wasn't connected to Baker's protected speech.  That free-standing evidence doesn't factor into my judging the extent of Baker's disruption.  *See Gardetto v. Mason*, 100 F.3d 803, 816 (10th Cir. 1996) ("Although the defendants presented a great deal of evidence relating to episodes of rude and inappropriate conduct that may have interfered with the efficiency of [a college's] operations, none of the episodes involved the four remaining speech incidents at issue in this case.").

The "disruption" here doesn't come close to the level of *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 462 (3d Cir. 2015), where witnesses testified that, after a teacher published a series of inflammatory (to say the least) blog posts, the school was "like a ticking time bomb" and "so incendiary" that the administration "thought [they were] going to have a riot or sit-in or worse."

[225] *De Ritis v. McGarrigle*, 861 F.3d 444, 456 (3d Cir. 2017), does not control.  First, Baker has more interest in engaging in her speech than did the plaintiff in *De Ritis*, whose speech was "more a private grievance than an instance of legitimate whistleblowing." *Id.* at 457. Second, though Baker testified that she did not have much information to support some of her letter topics, drawing all inferences in her favor, there is not enough evidence in the record for me to conclude that she showed a "continued failure to verify and substantiate" her allegations that "approache[d] reckless indifference to their veracity." *Id.*  Third, a (presumably pretty large) public school is different than "a small office of twenty-seven public defenders" where the plaintiff had the duty of representing the defendant's positions "before the courts and the public." *Id.* at 458.

Genovese and Kocher told CMSU that they could not work with Baker, and Kocher and Genovese told CMSU that Baker was difficult to work with and that they were at a loss as to what to do.  Genovese and Kocher gave CMSU very negative feedback and commentary on Baker's performance.  Their meeting with CMSU was, at its core, a performance review of Baker (without Baker even present).

The CMSU survey responses were another factor in Baker's termination.  Genovese, Kocher, and Rado filled out negative surveys and submitted them to CMSU for CMSU's consideration.  The opening paragraph of the surveys specifically stated that CMSU was "requesting this information as part of our employee evaluation process,"[226] and Gorrell's cover email stated that she needed the surveys, which she called "a questionnaire/evaluation," "in order to complete an evaluation of Stephanie Baker's work performance."

Each of these actions – the complaints in the September 12, 2016 meeting, and the survey responses – constituted negative employment evaluations of Baker.  Given that these evaluations were each factors in Baker's termination, the Court can infer that they "adversely affected the terms and conditions of [Baker's] employment."  And as such they were adverse actions.  *Clark v. Philadelphia Hous. Auth.*, 701 F. App'x 113, 117 (3d Cir. 2017); *see Suppan v. Dadonna*, 203

---

[226]  ECF No. 55 Ex. 38.

F.3d 228, 234-35 (3d Cir. 2000) (placing plaintiffs lower on promotion ranking lists was adverse action).[227]

### 3. A Causal Link Between Baker's Conduct and Defendants' Actions

Whether there was a "causal link between [Baker's] constitutionally protected conduct and [Defendants'] retaliatory action" remains a genuine issue of material fact that the jury needs to decide. As a threshold matter, there is a "suggestive temporal proximity" between Baker's conduct and the Defendants' alleged retaliatory action; this cuts toward finding the requisite "causal link."[228] The Court can infer from the facts that about a month, at most, passed between Genovese and Rado reading the letter and CMSU's termination of Baker. And less time passed from the letter-reading to the alleged intermediate adverse actions. *See Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001) (finding a gap of over three weeks as a "suggestive temporal proximity"); *cf. Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) (explaining that temporal proximity between an employee's protected conduct and the employer's adverse action

---

[227] *See also Shenk v. Pennsylvania*, No. 1:11-CV-1238, 2013 WL 1969311, at *9 (M.D. Pa. May 13, 2013) (in FMLA retaliation context, "[a]lthough negative performance evaluations in and of themselves are generally not considered to be adverse employment actions, they can constitute an adverse employment action when accompanied by threatening statements or other tangible job consequences."); *Boandl v. Geithner*, 752 F. Supp. 2d 540, 565 (E.D. Pa. 2010) (negative performance evaluation was adverse action).

[228] Yet it does not cut all the way—as CMSU points out, "temporal proximity merely provides an evidentiary basis from which" the Court can draw an inference. *Chinniah v. E. Pennsboro Twp.*, 761 F. App'x 112, 117 (3d Cir. 2019) (internal citations omitted).

coupled with inconsistent reasons given for the action can call into doubt the employer's stated basis for the action).

With respect to the BASD Defendants, the September 12, 2016 meeting participants discussed the letter and its contents. And Kocher and Genovese expressed suspicion about Baker's involvement with the letter. Kocher and Genovese also relayed that Baker had been "taking sides" and "trying to get teachers to align with the superintendent to go against the school administration." Genovese, Kocher, and Rado's survey responses contained four references to Baker's protected activity. Given the Court's duty to draw all inferences in the facts in favor of Baker, the Court declines to find (a) that the anonymous letter and Baker's speaking to other BASD faculty about speaking to the superintendent was not "a substantial motivating factor in [the BASD Defendants'] decision to take the adverse action[s]," and (b) that the BASD Defendants would have taken the same action even in the absence of the protected conduct. *See Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 981 (3d Cir. 1997) (finding a "material dispute of fact as to whether [plaintiff's] reports were a motivating factor in [defendant's] discharge decision" and thus overturning summary judgment decision); *see generally Andes v. New Jersey City Univ.*, 419 F. App'x 230, 233 (3d Cir. 2011) (in discrimination claim at summary judgment procedural posture, plaintiff "need[ed] only point to evidence from which a fact-finder . . . might reasonably disbelieve [defendant's] articulated legitimate reason for its actions.").

With respect to CMSU, the contents of the letter played a role in the decision to terminate Baker. Also, the Court, drawing all inferences from the facts in Baker's favor, cannot ascertain whether the letter, and Baker's speaking to other BASD faculty about speaking to the superintendent, were "a substantial motivating factor" in CMSU extending Baker's probationary period and issuing the surveys. As a general matter, the Court cannot ascertain whether the letter and Baker's speaking to other BASD faculty about speaking to the superintendent "[were] a substantial motivating factor in [CMSU's] decision to take the adverse action[s]." The Court also cannot ascertain whether CMSU would have taken the same actions even in the absence of Baker's protected conduct. The Court thus cannot order summary judgment for Baker or for CMSU on these grounds. *See Azzaro*, 110 F.3d at 981.

### c. Conspiracy

Baker's § 1983 claim against CMSU also hinges on whether she can make out that CMSU conspired with Genovese and Kocher to retaliate against Baker.[229] "To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quotations omitted) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970). As explained above, Baker's claim that CMSU deprived her of her

---

[229] *See* ECF No. 30 ¶ 69.

constitutional rights by terminating her remains tenable at this juncture.  Baker

argues that these defendants formed the requisite "understanding" through the

September 12, 2016 meeting.[230]

In the absence of direct proof, the Court can infer an "understanding"

through circumstantial evidence.  "Such circumstantial evidence may include that

the alleged conspirators did or said something to create an understanding, the

approximate time when the agreement was made, the specific parties to the

agreement, the period of the conspiracy, or the object of the conspiracy."

*Jutrowski*, 904 F.3d at 294 (citations omitted).  "[I]nferring mental state from

circumstantial evidence is among the chief tasks of factfinders."  *Kedra v.

Schroeter*, 876 F.3d 424, 444 (3d Cir. 2017).  Therefore, a party can only

overcome an allegation of conspiracy at summary judgment when "the moving

parties' submissions foreclose the possibility of the existence of certain facts from

which it would be open to a jury to infer from the circumstances that there had

been a meeting of the minds."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986) (internal citations and alterations omitted).

Here, Baker has done enough to create a genuine issue of fact as to whether

Defendants "reached an understanding" in the September 12, 2016 meeting.  The

meeting participants discussed the letter and its contents, with Kocher and

Genovese expressing suspicion about Baker's involvement in writing it.  Kocher

---

[230]  ECF No. 66 at 27-29.

and Genovese marshaled many criticisms of Baker, saying that she was "difficult to work with" and "questioned authority," saying Baker was "taking sides" by trying to go to the superintendent, saying they were "kind of at a loss now as to what to do," and alleging Baker's inappropriate comments and unprofessional and disrespectful demeanor. Genovese and Kocher also expressed that they could not work with Baker anymore. CMSU found the meeting "astound[ing]" and "disappoint[ing]" and "that there was irreparable damage perhaps" with school administration. CMSU drafted a termination letter for Baker three days later.

The aggregate of these comments and their aftermath is enough to create a genuine issue of fact on the conspiracy issue. *See Cole v. Encapera*, 758 F. App'x 252, 257 (3d Cir. 2018), *cert. denied sub nom. Shultz v. Cole*, 139 S. Ct. 2676 (2019) (genuine issue of fact precluded summary judgment on conspiracy claim where officers harassed and threatened bar patrons after bar owner reported police misconduct).[231] Defendants have not "foreclose[d] the possibility" of facts from which a jury could infer a meeting of the minds, *Anderson*, 477 U.S. at 249, especially given that "[i]nferring mental state from circumstantial evidence is among the chief tasks of factfinders." *United States v. Wright*, 665 F.3d 560, 569

---

[231] *See Klein v. Madison*, 374 F. Supp. 3d 389, 421 (E.D. Pa. 2019) (in summary judgment posture, one conversation between defendants was sufficient evidence of civil conspiracy); *Brantley v. Wysocki*, 145 F. Supp. 3d 407, 412 (E.D. Pa. 2015), aff'd, 662 F. App'x 138 (3d Cir. 2016) (in summary judgment posture, allegations that one defendant asked law enforcement to investigate an incident and said that she and plaintiff didn't get along was sufficient evidence of civil conspiracy).

(3d Cir. 2012). The Court finds that Baker's claim that Defendants conspired against her survives summary judgment.

### d. Qualified Immunity

The BASD Defendants argue that Baker "possessed no clearly defined right to be free from [Genovese and Kocher's] actions of meeting with and reporting her behavior to her employer and [Genovese, Kocher, and Rado] memorializing their opinions of her behavior in surveys issued to them by her employer."[232] They are mistaken. As the above implies, at the time of the BASD Defendants' alleged retaliatory actions, it was "clearly defined"—or, in the Supreme Court's parlance, "clearly established"[233]—that the BASD Defendants could not punish Baker's protected speech with negative employment evaluations that factored into her ultimate termination. *See Clark*, 701 F. App'x at 117; *Suppan*, 203 F.3d at 234-35. Thus, the BASD Defendants do not enjoy the protections of qualified immunity.

### e. Conclusion

As I explained in the above analysis, Baker's § 1983 claim of retaliation against CMSU and the BASD Defendants survives summary judgment.

### 3. Baker's § 1983 Claim of Deprivation of Rights

Baker marshals a separate § 1983 claim against CMSU, alleging that after "her legitimate probationary period had expired," CMSU "terminated Ms. Baker

---

[232] ECF No. 60 at 29-30.

[233] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)

without notice or an opportunity to be heard," therefore depriving her "of a property interest without due process of law."[234] "Extension of an employee's probationary period is at the discretion of the employer." *Golaschevsky v. Com., Dep't of Envtl. Res.*, 683 A.2d 1299, 1301 n.4 (Pa. Commw. Ct. 1996), *aff'd sub nom. Golaschevsky v. Com., Dep't of Envtl. Prot.*, 720 A.2d 757 (Pa. 1998) (citing 4 Pa. Code § 97.31). But an extension of probation "as a pretext for some improper purpose" constitutes an abuse of such discretion. *See Pennsylvania Dep't of Pub. Welfare v. State Civil Serv. Comm'n*, 707 A.2d 589, 591 (Pa. Commw. Ct. 1998); *see generally* 71 Pa. C.S.A. § 2404 ("The appointing authority may remove an employee during the probationary period if, in the opinion of the appointing authority, the probation indicates that the employee is unable or unwilling to perform the duties satisfactorily or that the employee's dependability does not merit continuance in the service.").

CMSU's September 15, 2016 extension of Baker's probation came three days after the September 12, 2016 meeting with Genovese and Kocher. In that meeting, Genovese and Kocher expressed suspicion about Baker's involvement with the letter. They also said that Baker was "difficult to work with" and "questioned authority" and that Baker was "taking sides" and "trying to get teachers to align with the superintendent to go against the school administration." Genovese and Kocher expressed that they could not work with Baker anymore.

---

[234] ECF No. 30 ¶¶ 80-82.

Gorrell testified that after the meeting CMSU felt there was "irreparable damage perhaps between the relationship that was going on there with school administration."  The combination of these circumstances and comments pushes the Court to find a genuine issue of material fact as to whether CMSU's September 15, 2016 extension of Baker's probation was "a pretext for some improper purpose"—that is, firing Baker as retaliation.  Baker's § 1983 claim of deprivation of rights thus survives summary judgment.

### 4.    § 1983 Applied to Municipal Liability

Baker's § 1983 claims of retaliation and deprivation of property interest against CMSU are both targeting a municipality.  This presents the Court with another issue it must confront in deciding whether Baker's § 1983 claims can move forward.  "Local governments, such as school districts, cannot be held liable under § 1983 for the acts of their employees.  Instead, local governments may be found liable under § 1983 for 'their own illegal acts.'"  *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 174-75 (3d Cir. 2017), *as amended* (Sept. 22, 2017) (*citing Connick v. Thompson*, 563 U.S. 51, 60 (2011).  "A municipality is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation."  *Id.* at 175.  "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir.

1996) (quotations and alteration omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (plurality opinion)). Customs are "practices of state officials so permanent and well settled as to virtually constitute law." *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

The parties agree that Beach was CMSU's "decisionmaker possessing final authority to establish municipal policy with respect to" Baker's termination, and his decision to terminate Baker represented CMSU's "official . . . edict" on the matter. *Kneipp*, 95 F.3d at 1212. CMSU argues that Baker has not established that Beach had "the state of mind required to prove the underlying violation." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). But "proof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably, and "the conclusion that the action taken or directed by the . . . authorized decisionmaker . . . violates federal law will also determine that the municipal action was the moving force behind the injury of which plaintiff complains." As I explained above in my analysis on the substance of Baker's § 1983 claims against CMSU, it is a genuine issue of material fact whether Beach "intentionally deprived [Baker] of a federally protected right" and whether that action "violate[d] federal law." As such, I cannot conclude as a matter of law that Beach did not have the requisite "state of mind required." *Id.*

CMSU also argues that Beach did not act with the requisite "deliberate indifference"—which, as the Supreme Court defined in *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, "require[s] proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. As I explained above, Beach attended the meeting with Genovese and Kocher, where the letter was discussed. Beach knew of Genovese and Kocher's suspicions that Baker wrote the letter. And the letter played at least some role in CMSU's decision to terminate Baker. Given all of this, I cannot find the absence of a genuine issue of material fact as to whether Beach "disregarded a known or obvious consequence of" terminating Baker—that such action would constitute retaliation and the deprivation of Baker's property interests—when making his decision. CMSU's defense that it is not liable as a municipality thus fails at this summary judgment phase.

### 5.     Baker's Pennsylvania Whistleblower Law Claim

The Pennsylvania Whistleblower Law ("PWL") states that "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against an employee . . . because the employee . . . makes a good faith report [about] an instance of wrongdoing or waste by a public body or . . . any other employer."[235] Baker "must show by a preponderance of the evidence that, prior to the alleged reprisal, [she] had reported or was about to report in good faith, verbally or in writing, an instance

---

[235]  43 P.S. § 1423(a).

of wrongdoing or waste to the employer or an appropriate authority."[236]  As I analyzed in my Memorandum Opinion dealing with Defendants' motions to dismiss, Baker was an "employee" under the PWL.[237]

### a.    Good Faith

The PWL defines a "good faith report" as a report of wrongdoing or waste "which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true."[238]  CMSU argues that the anonymous letter "was not a good faith report because it was motivated by malice and was for personal benefit."[239]  Drawing all factual inferences in favor of Baker, the non-moving party, it is plausible that Baker contributed to her sections of the letter with motivations other than malice or her personal benefit.  In particular, the letter lists plausible concerns with BASD's educational system and ability to serve its students.[240]  This presents a genuine issue of material fact.

The BASD Defendants argue that Baker did not have "reasonable cause regarding nearly all of the allegations in the letter she coauthored."[241]  Here Baker

---

[236]  43 P.S. § 1423(b).

[237]  ECF No. 26 at 21-22.

[238]  43 P.S. § 1422.

[239]  ECF No. 56 at 16.

[240]  *Compare with Mosley v. City of Pittsburgh Pub. Sch. Dist.*, 702 F. Supp. 2d 561, 584 (W.D. Pa. 2010) ("Noticeably absent from Plaintiff's memorandum is any mention of an alleged violation of Pennsylvania law or that he was concerned with the impact of the wrongdoing on the students or School District, or that he wanted this information disseminated to others.")

[241]  ECF No. 60 at 27.

has provided personal knowledge in support of the allegations to which she contributed to. The Court concedes that this knowledge, in some cases, does not appear to be tremendously robust. But again, drawing all factual inferences in favor of Baker, the Court finds that Baker's reasonable cause is another genuine issue of material fact.[242]

### b.    Wrongdoing or Waste

The PWL prohibits retaliation for reports of "wrongdoing or waste."[243] The PWL's definition of "wrongdoing" is expansive, and includes violations of state law that are "not of a merely technical or minimal nature."[244] But a whistleblower's "reported wrongdoing must either be that of the employer or a violation of a law or code of conduct that the employer is charged to enforce for the good of the public." *Sea v. Seif*, 831 A.2d 1288, 1291 (Pa. Commw. Ct. 2003). The PWL defines "waste" to include "[a]n employer's conduct . . . which result[s] in substantial abuse, misuse, destruction, or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."[245]

---

[242] *See generally Smith v. PrimeCare Med., Inc.*, No. 1:08-CV-1397, 2008 WL 5048257, at *8 (M.D. Pa. Nov. 24, 2008) (plaintiff's statement that he "observed lapses in [defendant's] practices" was relevant evidence to his "good faith belief that the [defendant] was not fulfilling its obligations").

[243] Note the disjunctive: a report of wrongdoing *or* a report of waste will suffice.

[244] "Wrongdoing" is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. § 1422. *See also Golaschevsky v. Com., Dept. of Environmental Protection*, 554 Pa. 157, 162-63 (1998).

[245] 43 P.S. § 1422.

As I stated above in the factual background, the video incident did not trigger a statutory reporting duty. But the portions of the anonymous letter that Baker authored state that BASD was allowing students to graduate "despite excessive absences" and without "meet[ing] the PA state required academic graduation requirements." This could constitute a violation of 24 P.S. § 15-1504(a), which requires a school year of a minimum of 990 hours of instruction at the secondary level, as well as a violation of 22 Pa. Code § 57.31, which sets out Pennsylvania's high school graduation requirements. Baker's portions also report that BASD was "not in compliance with the state mandated anti-bullying program." Drawing all inferences in the facts in favor of Baker, this could constitute a reference to a violation of 24 P.S. § 13-1303.1-A, which mandates that schools adopt an anti-bullying policy that "may provide for prevention, intervention and education programs." And Baker's portions also report that "the Benton school district has not attended any of the mandated meetings for [the 339] program." This could constitute a violation of 22 Pa. Code § 339, which mandates that schools develop a guidance plan for career development.

Baker has, then, reported potential violations of multiple Pennsylvania laws and regulations. But Baker was not reporting wrongdoing of her employer, CMSU. And CMSU was not "charged to enforce for the good of the public" the violations that Baker reported. Accordingly, the portions of the anonymous letter that Baker authored do not constitute "wrongdoing" under the PWL. *See Sea v.*

*Seif*, 831 A.2d at 1292 ("it is undisputed that the statutory duties of [plaintiff's] employer . . . have nothing to do with investigating activities of members of the General Assembly").  But, drawing all inferences in Baker's favor, this conduct could constitute BASD's "misuse" or "abuse" of public funds.[246]  There is at least a genuine dispute of material fact over whether Baker's portions of the anonymous letter constituted a report of "wrongdoing or waste."

### c.    Causation

In order to show the causation that the PWL requires, Baker must "show by concrete facts or surrounding circumstances that the report led to [retaliation against her], such as that there was specific direction or information [she] received not to file the report or there would be adverse consequences because the report was filed."  *Gray v. Hafer*, 651 A.2d 221, 224 (Pa.Cmwlth. 1994), *aff'd per curiam*, 669 A.2d 335 (Pa. 1995).

As I went over above, whether Baker has shown "surrounding circumstances that the report led to" retaliation against her is a genuine issue of material fact that survives summary judgment.  First, the September 12, 2016 meeting participants discussed the letter and its contents.  Second, Genovese and Kocher expressed suspicion about Baker's involvement with the letter during the September 12, 2016

---

[246] *See Bifano v. Borough*, No. CV 3:16-0245, 2016 WL 7404610, at *15 (M.D. Pa. Dec. 22, 2016) (a police officer's repeated billing of the borough "despite not performing his work duties" constituted waste); *compare with McClain v. Munn*, No. C.A. 06-278, 2008 U.S. Dist. LEXIS 28985, at *12 (W.D. Pa. Apr. 9, 2008) (a "*de minimis* disruption of the police department's daily activities" did not constitute waste)

meeting.  Third, Rado referenced the letter twice in her survey responses.  Fourth, the contents of the anonymous letter played at least some role in the decision to terminate Baker.

### d.    Appropriate Authority

The PWL provides that a whistleblower must direct their report to the employer or an appropriate authority."  Baker was an employee of CMSU, not BASD.  As she directed the letter to BASD's superintendent and school board, her chances of success here hinge on whether those entities were the "appropriate authority."

The PWL defines an "appropriate authority" as:[247]

A Federal, State or local government body, agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency or organization. The term includes, but is not limited to, the Office of Inspector General, the Office of Attorney General, the Department of the Auditor General, the Treasury Department, the General Assembly and committees of the General Assembly having the power and duty to investigate criminal law enforcement, regulatory violations, professional conduct or ethics, or waste.

No evidence in the record suggests that BASD – whether its superintendent or school board – has "jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste."  Of course, the laws and regulations here imposed legal duties on BASD.  But BASD is not charged with

---

[247]  43 P.S. § 1422.

enforcing violations of these laws and regulations and administering appropriate punishment. It's not a law enforcement agency, regulator, or professional conduct board. It's a school – charged with educating, not with enforcing violations like those Baker reported. It thus was not the "appropriate authority."[248]

### e. Conclusion

As I explained in the above analysis, Baker's Pennsylvania Whistleblower Law claim against CMSU and the BASD Defendants does not survive summary judgment. The Court dismisses this claim.

### 6. Baker's Defamation Claim

Finally, Baker claims that Defendants Genovese, Kocher and Rado "published defamatory and false communications" about her.[249] To succeed on this defamation claim, Baker must prove:[250]

(1) The defamatory character of the communication;
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

---

[248] *See Ambrose v. Twp. of Robinson, Pa*, No. CIV.A. 99-1218, 2000 WL 35907776, at *9 (W.D. Pa. Oct. 11, 2000) (understanding "appropriate authority" to be "any public authority having the power and duty of inquiring into the lawfulness of the questioned conduct and causing its cessation if the conduct appears to be in violation of the law," and finding critical whether an entity was ""charged with executive functions to investigate and enforce the laws").

[249] ECF No. 30 ¶ 85.

[250] 42 Pa. C.S.A. § 8343(a).

And Genovese, Kocher and Rado must prove:[251]

(1) The truth of the defamatory communication.
(2) The privileged character of the occasion on which it was published.
(3) The character of the subject matter of defamatory comment as of public concern.

### a. The Statements in Question

Baker alleges that the following statements were defamatory.

- Defendant Rado (from her survey response): "In [the anonymous] letter, confidential information was disseminated to community members, as student's names and private case information was mentioned in detail."[252]

- Defendant Genovese (from her survey response): "It was reported to me by [Kocher] that [Baker] went into a meeting at CMSU on September 15, 2016 and reported to their team that I gave a directive to my SAP Team not to report a 'reportable' incident to parents and/or Children and Youth. I was also told by [Kocher] that the next day, she recanted that version of her story to her boss and then stated that I wasn't in fact the one who gave the directive, but instead it was Kelly that gave it on my behalf. That is an outright lie which states I gave an illegal directive. This is an attack on my professionalism, my ethics, and my character not only as the principal of this school, but as an individual."[253]

Baker also states in her Amended Complaint that Kocher also "made negative and false comments about Ms. Baker, which were part of the scheme they concocted with CMSU to justify CMSU's termination of Ms. Baker's employment." ECF No. 30 ¶ 63. But the only factual support Baker provides is in her "Additional Factual Allegations and Evidence ("Plaintiff's SoF")"—*see* ECF

---

[251] 42 Pa. C.S.A. § 8343(b).

[252] ECF No. 54 Ex. 18.

[253] ECF No. 54 Ex. 16.

No. 67 ¶ 269.[254]  The Court cannot accept this as an undisputed material fact, for two reasons.  First, this is not Baker's motion for summary judgment.  *See* Fed. R. Civ. P. 56.  Second, this particular "Factual Allegation[]" rests wholly on Baker's uncorroborated deposition testimony.  ECF No. 67 ¶ 269; Baker Dep. 71:13-24.  The Court has license to reject this allegation.  *See Solomon v. Soc'y of Auto. Engineers*, 41 F. App'x 585, 586 (3d Cir. 2002) (court "correctly rejected" allegations where the "only evidence in support of these claims was [plaintiff's] own testimony); *but see* Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990) (uncorroborated deposition testimony was sufficient to create genuine issue of discriminatory intent where conduct was "often subtle and difficult to prove").  Thus, Baker has not carried her burden, and the Court dismisses her defamation claim against Kocher.  *See* ECF No. 30 at 28-29.

### b.    Truth

The Court cannot find that there is not a genuine issue of material fact as to whether Rado's statement was true.  The anonymous letter was sent to BASD's superintendent and to school board members.  It is plausible that those recipients were not improper "community members."  But, as the BASD Defendants point

---

[254]  I note that Baker's counsel describes these "Additional Factual Allegations" as "mirror[ing]" the allegations contained in the Amended Complaint which stated a claim."  ECF No. 67 at 30 n.4.  Yet the specific "Additional Allegation" for Kocher—that she "told a student that Ms. Baker was terminated because she must have done something horribly wrong"—was nowhere to be found in the Amended Complaint.  Perhaps not a mirror, then, but a magnifying glass.

out in their papers, it is also plausible that they were. Without further ventilation of the facts, the Court cannot make a conclusive ruling on this issue.

The Court has concluded in its factual discussion that certain portions of Genovese's statement are true. These are (1) what Genovese said Kocher reported to her, (2) Genovese's giving the directive, through Kocher, and (3) Baker's lying when stating that Genovese was giving an illegal directive.[255] But the Court cannot find that there is not a genuine issue of material fact as to whether Genovese's statement that Baker was making "an attack of my professionalism, my ethics, and my character not only as the principal of this school, but as an individual" was true. The parties have not explored the factual issues of (1) Baker's motivations in making her statement about Genovese's directive, and of (2) the reverberations of this statement, to full conclusion.

### c.    Privileged Character

"[P]roper occasions giving rise to a conditional privilege exist when: (1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved." *Beckman v. Dunn*, 419 A.2d 583, 588 (Pa. Super. 1980). Here, given the subject matter of these statements—the possible dissemination of confidential educational

---

[255] The Court can infer portion (2) from the combination of (a) Kocher informing the SAP group that a decision had been made, and (b) Kocher and Ross right afterwards joking as to whether Baker was going to be the one to tell Genovese that she disagreed with Genovese's decision.

information, and Genovese giving the directive to the SAP meeting personnel—Genovese and Rado, as well as the BASD superintendent and board, had a clear interest, and, therefore, a conditional privilege. *See generally Howard v. Deklinski*, No. 01-4171, 2002 WL 31501850 (3d Cir. Nov. 12, 2002) (information in reports pertained to privileged purpose in part as it "related to [plaintiff's] job performance and interaction with other employees"); *see also Daywalt v. Montgomery Hosp.*, 573 A.2d 1116, 1119-20 (Pa. Super. 1990) (no abuse of privilege in communication of possible misconduct to those with an employment "interest in [plaintiff's] activities," who were entitled to know of [defendant]'s suspicions").

But a defendant cannot abuse their conditional privilege. "Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence," "made for a purpose other than that from which the privilege is given," "to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege," or "includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose." *Id.* "Legal malice consists of a wrongful act, done intentionally without just cause or excuse . . . or generated from reckless or wanton disregard of another's rights." *Id*. at n.3.

Here, the Court cannot find that there is not a genuine issue of material fact as to whether Rado was negligent or showed legal malice in making her statement that the anonymous letter was sent to "community members." It remains possible

that Rado did not know (which would open the door to a potential finding of negligence) or that she knew (which would allow for a potential finding of legal malice) that BASD's superintendent and board did not constitute improper "community members" and that, in turn, Baker's production of the letter did not represent improper dissemination of information. It is also possible that BASD's superintendent and board did in fact constitute improper "community members," which would remove both negligence and legal malice from the field of play.

With respect to Genovese, the Court finds that there is a genuine issue of material fact as to whether she made her statement "for a purpose other than that from which the privilege is given." In particular, Genovese and Baker had a disputatious history that might have informed the purpose of her statement. This history could have pushed Genovese to write this survey response as a means of attacking Baker's own credibility.

### d.    Conclusion

As I explained in the above analysis, Baker's defamation claim survives summary judgment as to Genovese and Rado. Baker's defamation claim is dismissed as to Kocher.

### 7.    Punitive Damages

In her Amended Complaint, as modified by her Brief in Opposition, Baker demands punitive damages against Genovese, Kocher, and Rado for Count One (§

1983 retaliation) and Count Four (defamation).[256]  As I just explained right above, the Court is dismissing Count Four as to Kocher.  So the Count Four analysis here only deals with Genovese and Rado.

### a.  Punitive Damages on Count One

In an action under § 1983, a jury can assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Here, Baker has done enough to create a genuine issue of material fact as to whether Genovese, Kocher, and Rado's conduct was "motivated by evil motive or intent" or "involve[d] reckless or callous indifference to the federally protected rights of others."  Baker had disputes and points of contention with all three individual defendants.  Genovese and Rado read the letter; Kocher knew about the letter from Genovese.  Genovese and Kocher made their complaints in the September 12, 2016 meeting; these complaints were one factor in CMSU's decision to terminate Baker.  And Genovese and Rado and Kocher provided negative responses on the surveys, knowing that these surveys would be another

---

[256] ECF No. 30 at 24-25; ECF No. 66 at 45.  Baker purports to also demand punitive damages on its Pennsylvania Whistleblower Law claim.  *See* ECF No. 66 at 45.  But Baker's Amended Complaint doesn't mention punitive damages for this claim.  *See* ECF No. 30 at 25 ¶ B.  In any event, (a) the Court has dismissed this claim, and (b) the Pennsylvania Whistleblower Law doesn't provide for punitive damages.  *See* 42 Pa. C.S. §§ 8501, 8541, 8553; *see also Rankin v. City of Phila.*, 963 F. Supp. 463, 477-80 (E.D.Pa. 1997) (dismissing plaintiff's punitive damages claim while noting that "nowhere among the expressly authorized remedies does the Whistleblower Law mention punitive damages")

factor in CMSU's decision to terminate Baker. The combination of these facts, with inferences from each drawn in favor of Baker, ensures that Baker's demand for punitive damages on her § 1983 claim survives summary judgment.[257]

### b. Punitive Damages on Count Four

In a private party's defamation action, in order to award punitive damages a jury must conclude that there was clear and convincing evidence that the defendants acted with "actual malice." *Hepps v. Philadelphia Newspapers, Inc.*, 485 A.2d 374, 388 (Pa. 1984), *reversed on other grounds*, 475 U.S. 767 (1986). A plaintiff can establish "actual malice" either "by proving the publication was made with the knowledge of the falsity of its content or with reckless disregard of whether it was false or not." *Id.* at 389.

The genuine issues of material fact that I described above in my analysis of the substance of Baker's defamation claim control my analysis here. I cannot conclude that there is no genuine issue of material fact as to whether either Genovese or Rado made their statements in their survey responses "with the knowledge of the falsity of its content or with reckless disregard of whether it was false or not." This is because there are still lingering genuine issues of material fact as to whether either of these statements are true in the first place.

---

[257] *See Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 489 (M.D. Pa. 2016) (enough evidence to support a § 1983 demand for punitive damages).

### c. Conclusion

As I explained in the above analysis, Baker's demand for punitive damages survives summary judgment as to her Count One claim against Defendants Genovese, Kocher, and Rado and her Count Four claim against Defendants Genovese and Rado. Baker's demand for punitive damages as to her Count Two claim is dismissed. Baker's demands for punitive damages against Defendants CMSU and BASD are also dismissed.

## III. CONCLUSION

For all the reasons I have stated above, the Court concludes that:

- Baker's § 1983 claim of retaliation against CMSU and Genovese, Kocher, and Rado survives summary judgment.

- Baker's § 1983 claim of deprivation of rights against CMSU survives summary judgment.

- Baker's Pennsylvania Whistleblower Law claim against CMSU and the BASD Defendants is dismissed.

- Baker's defamation claim survives summary judgment as to Genovese and Rado. Baker's defamation claim is dismissed as to Kocher.

- Baker's demand for punitive damages survives summary judgment as to her Count One claim against Defendants Genovese, Kocher, and Rado and her Count Four claim against Defendants Genovese and Rado. Baker's demand for punitive damages as to her Count Two claim is dismissed. Baker's demands for punitive damages against Defendants CMSU and BASD are also dismissed.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge